The **EXCHANGE NATIONAL BANK OF CHICAGO, Plaintiff-Appellee,**

v.

**TOUCHE ROSS & CO., Defendant-Appellant.**

**No. 795, Docket 75–7633.**

United States Court of Appeals, Second Circuit.

Argued April 8, 1976.

Decided June 9, 1976.

Arnold I. Roth, New York City (John C. Fleming, Jr., Arthur Linker, and Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City of counsel), for defendant-appellant.

Paul J. Newlon, New York City (Steven B. Rosenfeld, Sidney H. Stein, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY, MANSFIELD and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal raises the vexing question how far instruments bearing the form of promissory notes are securities within the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.

### The Facts and the Proceedings in the District Court

This action by The Exchange National Bank of Chicago (the Bank) against the well-known accounting firm of Touche, Ross & Company (Touche) was brought in the District Court for the Northern District of Illinois and was transferred, pursuant to 28 U.S.C. § 1404(a), to the District Court for the Southern District of New York. The complaint was in four counts. Count I alleged violation of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and the SEC's Rule 10b–5; Count II claimed a violation of § 18(a) of the 1934 Act; Count IV asserted a violation of §§ 10(b), 15(c), 17(a) and 18(a) of the 1934 Act; and Count III was a pendent state law claim for negligence. All

four counts concerned the same transactions by the Bank and, apparently, the same conduct by Touche.[1]

The transactions were between the Bank and a New York brokerage firm, Weis, Voisin & Co., Inc., later Weis Securities, Inc. (Weis), which was a member of the New York Stock Exchange (NYSE) and the American Stock Exchange. These transactions were the Bank's purchase from Weis of three unsecured subordinated notes dated July 31, 1972, in the aggregate principal amount of ($1 million) The conduct was Touche's issuance on July 7, 1972, of opinions saying, among other things, that Weis' Statement of Financial Condition as of May 26, 1972 (the "Statement") and Weis' "Answers to Financial Questionnaire and Additional Information" (the Report), which Weis filed with the SEC pursuant to § 17 of the Securities Exchange Act, fairly presented the financial position of Weis and conformed to generally accepted accounting principles. The Bank alleged that it had relied on these opinions as well as the Statement and the Report, and that the latter were materially false and misleading in numerous respects as Touche knew or should have known when it issued its opinions; that when the false and misleading entries were discovered in May, 1973, Weis had already been placed in receivership and was then being liquidated; and that the notes have become worthless.

Touche moved to dismiss the complaint. Although the motion claimed that the complaint was defective in its allegations of fraud[2] and that a curative amendment would not be possible, the attention of the parties and the district court seems to have become concentrated on the contention that the notes were not securities within the 1933 or 1934 Acts; that the court thus had no jurisdiction over the three federal counts; and that, diversity of citizenship being absent, the pendent count should likewise be dismissed. A memorandum accompanying the moving affidavit discussed the issue of the status of the notes. Entitled "Promissory Note," with the amount and the date, July 31, 1972, at the top, each note extended over nearly nine typewritten pages. The three notes were payable on July 31, 1973, October 31, 1973, and January 31, 1974, respectively, "upon written demand received by the Company at least six (6) months prior to such date, or upon such date thereafter as may be specified by the Lender upon written demand received by the Company at least six months prior to the payment date so specified."[3] Interest was payable after each note's maturity date, at a rate "3% in excess of the prime commercial loan rate of the Lender then in effect for short-term borrowings, but in no event less than 9% per annum." The rights of the holder were subject and subordinate to all general creditors but were senior to all other subordinated creditors except existing obligations to Fidelity Corporation and Security National Bank.[4] The note was prepayable on three days' written notice from the Company with the prior writ-

1. Count II alleged that Touche "made statements" which were false and misleading, but in the absence of more particularized pleading we must assume that these "statements" were the July 7 and May 26 opinions that formed the basis of Count I.

2. Although a similar motion had been denied by Judge Decker when presented to the court of the Northern District of Illinois, that court was presumably (no opinion accompanied the denial) relying on the then-recent Seventh Circuit decision in *Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (1974) (upholding allegations that an accounting firm had violated Rule 10b–5 by its negligent conduct). Neither Judge Decker nor Judge Wyatt, who denied the motion on this score without prejudice to its renewal, had the benefit of the Supreme Court's reversal of the Seventh Circuit holding, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (1976).

3. The note would become immediately due and payable in the event of receivership, insolvency, etc.; in certain other instances of serious adversity to Weis, the note, with accrued interest, could be made due and payable six months after a declaration by the Lender.

4. The Fidelity Corporation Subordinated Note, dated February 23, 1971, was in the amount of $1 million. The Security National Bank held two Subordinated Notes, one dated November 26, 1971 and the other June 8, 1972, each in the amount of $1 million.

ten approval of NYSE. If any action were commenced by a general creditor within 12 months after the maturity of the note, Weis would furnish the holder with copies of the pleadings and the holder would have the right to contest the action if Weis did not do this in good faith. The note was transferable only to a person approved by NYSE as provided in its Rule 325.20. The Bank forewent any right to take as security any property of the "member organization" that might come into its possession and waived any right of set-off.

As indicated, several provisions of the notes were keyed to NYSE's Rule 325, entitled "Capital Requirements for Member Organizations and Individual Members." A basic proviso of this Rule was that no member "shall permit, in the ordinary course of business as a broker, his or its Aggregate Indebtedness to exceed 2000 per centum of his or its Net Capital. . . ."[5] "Aggregate Indebtedness" was defined to exclude, *inter alia*, "liabilities subordinated to general creditors pursuant to a separate agreement approved by the Exchange." Consistent with this, subordinated indebtedness appeared in Weis' balance sheet along with stockholder equity rather than as a current liability.

Opposing affidavits of Melvin K. Lippe, Vice Chairman of the Board of the Bank, of counsel, of a partner of the accounting firm of Coopers & Lybrand, who acted for the Trustee in the SIPC liquidation of Weis, and of a supervisor of the Administrative Staff of the Trustee in the Weis liquidation added flesh to the bare bones of the notes. The Lippe affidavit set forth the circumstances under which the Bank purchased the notes. Stripped of self-serving characterizations such as consistent references to the notes as investments, his factual allegations were substantially as follows:

In the spring of 1972 Lippe was Executive Vice President and Chief Administrative Officer of the Bank and was particularly concerned with expanding the Bank's business; he was not part of the staff which handled normal commercial loans. Early in March, 1972, he was notified by the manager of the Bank's recently opened branch office in Tel Aviv, Israel, that Weis had sought approximately $1 million for the expansion of its brokerage activities both in the United States and abroad. Because the Bank was interested in developing a closer relationship between its new Tel Aviv branch and that of Weis, the only American brokerage firm then operating in Israel, and the interest rate proposed by Weis was attractive, Lippe instructed the branch manager that the Bank might be interested.

Shortly thereafter Arthur T. Levine, Weis' Chief Executive Officer, and Sol Leit, its Chief Operating Officer, came to Chicago to negotiate with Lippe. Lippe continued to be interested because of the potential for the Bank's Tel Aviv branch. Levine and Leit indicated that the Bank would be expected to purchase subordinated promissory notes, which would be listed as part of Weis' net capital pursuant to Rule 325; they presented a form of such a note which they said was in conformity with Rule 325. They also exhibited copies of the notes held by Security National Bank and Fidelity Corporation, see note 4 *supra*. Lippe requested the Weis representative to forward financial statements and any other documents certified by Touche; this led to the sending of the documents previously mentioned. On July 19, 1972, the Bank agreed to purchase for $890,750 three unsecured subordinated notes in the aggregate principal amount of $1 million and the transaction was consummated on August 7, 1972.[6]

---

**5.** This has since been amended to set the standard of aggregate indebtedness, when this standard is appropriate, at 1000% of net capital, see New York Stock Exchange Constitution and Rules, Rule 325(b)(2), ¶ 2325 (1976).

**6.** The Bank learned "subsequently"—to wit, after Weis had gone into liquidation—that a bank and two insurance companies also held $3 mil-

lion of Senior Subordinated Notes issued under an agreement dated September 29, 1972, and that 37 other lenders held subordinated notes pursuant to a variety of agreements (entitled "Agreement Subordinating Account," "Agreement Subordinating Individual's Account," "Secured Demand Note Collateral Agreement," "Subordinated Debenture," "Cash Subordina-

A reply affidavit by Touche's counsel urged that "most of the matters upon which plaintiff Exchange Bank purports to rely" in establishing that the notes were securities "involve in large portion conversations and states of mind with respect to which defendant Touche Ross was not a party and had no prior knowledge, and which cannot bind defendant Touche Ross (if at all) unless it has the right to cross-examine in detail the makers of plaintiff's affidavits and other pertinent witnesses." Counsel requested that "if and to the extent that the affidavits submitted by plaintiff Exchange Bank are deemed to raise issues of fact, the Court should permit, as a preliminary matter, discovery limited to such issues so that a full record can be developed for the determination of the threshold issue of subject matter jurisdiction." However, except for those conclusory assertions categorized as reflecting the Bank's "investment motives," which we have disregarded, the affidavit gave no indication what facts were disputed or as to precisely what discovery was sought.

After hearing argument Judge Wyatt denied the motion to dismiss for want of subject matter jurisdiction "on the ground that the transaction seems more in the character of an investment than of a commercial loan." He believed, however, that the question was "a close one" which should be reviewed by this court before preparation for trial and offered to make the statement required by 28 U.S.C. § 1292(b). Such a statement was incorporated in the order denying the motion to dismiss, and a panel of this court granted leave to appeal.

### Propriety of Deciding a Rule 12(b)(1) Motion on Affidavits

■ We deal at the outset with a suggestion of the defendant that the district court could not properly deny its motion to dismiss for want of subject matter jurisdiction on the basis of factual statements in plaintiff's affidavits.

In *Land v. Dollar*, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), Mr. Justice Douglas referred to the "general rule [that] the District Court would have authority to consider questions of jurisdiction on the basis of affidavits as well as the pleadings." He footnoted this statement with the following:

In passing on a motion to dismiss because the complaint fails to state a cause of action, the facts set forth in the complaint are assumed to be true and affidavits and other evidence produced on application for a preliminary injunction may not be considered. But when a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, Fed.R.Civ.P. 12(b), the court may inquire, by affidavits or otherwise, into the facts as they exist. (Citations omitted.) 330 U.S. 735, n. 4, 67 S.Ct. 1009, 1011, 91 L.Ed. 1209.

Since 1947, however, Rule 12(b) was amended, effective March 19, 1948, to provide that a motion to dismiss for failure to state a claim based on matter outside the pleadings can be treated as a motion for summary judgment, without any corresponding amendment authorizing affidavits or other extra-pleading materials to be considered on a motion to dismiss for lack of subject matter jurisdiction. Thus there has been some controversy as to the use of such materials in the context of a 12(b)(1) motion, see *Winkelman v. New York Stock Exchange*, 445 F.2d 786 (3 Cir. 1971); cf. *Rosemound Sand & Gravel v. Lambert Sand & Gravel*, 469 F.2d 416 (5 Cir. 1972), based on the view that, since Rule 12 allows a "speaking" motion to be treated as a Rule 56 motion only when the motion is under subdivision (6), the rulemakers must have disapproved the use of extra-pleading material under another subdivision, particularly since this would deprive the plaintiff of the various Rule 56 safeguards.

The argument ignores the important difference that judgments under Rule 12(b)(6)

tion Agreement," and "Subordinated Promissory Note") while yet another dozen lenders held notes subordinated both to the general credi-

tors and to creditors of a brokerage firm whose assets Weis had purchased.

are on the merits, with *res judicata* effects, whereas judgments under Rule 12(b)(1) are not. We thus see no reason to conclude that the 1948 amendments to Rule 12(b) altered the long-standing "rule that [evidentiary matter presented by affidavit or otherwise] is proper where jurisdiction is challenged . . . ," Wright, Federal Courts 278–79 (1970). This was plainly the rule prior to the 1948 amendments, see *Land v. Dollar, supra,* and *Central Mexico L. & P. v. Munch,* 116 F.2d 85 (2 Cir. 1940), and a review of those amendments yields nothing to indicate an intention to change that. Instead it was the fact that the general demurrer for failure of a pleading to state a claim had been held not to be accompaniable by non-pleading material—in contrast to the practice in dealing with jurisdictional questions—that led the 1948 amendments to extend to the district courts generally the practice of this circuit whereby 12(b)(6) motions accompanied by non-pleading materials were treated as motions for summary judgment regardless of their "label or original basis," Notes of Advisory Committee on Amendments to Rules, reprinted following 28 U.S.C.A. Rule 12.

The only relevance of Rule 56 to a motion under Rule 12(b)(1) is that a body of decisions has developed under Rule 56 that offer guidelines which assist in resolving the problem encountered if the affidavits submitted on a 12(b)(1) motion should reveal the existence of factual problems. If this should occur, a court should consider allowing a party to utilize some of the procedures outlined in Rule 56(e), if this is requested, and conceivably a case could arise where even these would not suffice. But just as under Rule 56, a party opposing a Rule 12(b)(1) motion cannot rest on the mere assertion that factual issues may exist. *Beal v. Lindsay,* 468 F.2d 287, 291 (2 Cir. 1972); *Dressler v. MV Sandpiper,* 331 F.2d 130, 133 (2 Cir. 1964). Touche has not indicated what facts in plaintiff's affidavits, as distinguished from conclusory characterizations and arguments, it desires to controvert, and our decision that the motion to dismiss was properly denied does not turn on any facts which it could.

## The Merits

As we pointed out in *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 799 (2 Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973):

The Securities Act of 1933 and the Securities Exchange Act of 1934 differ in their method of handling short-term commercial paper. Under the 1933 Act, while § 2(1) provides that any note is a "security," § 3(a)(3) exempts from the registration and prospectus requirements "[a]ny note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." (However, § 17, the general anti-fraud provision, provides in subsection (c) that the exemptions of § 3 shall be inapplicable.) Instead of following this model in the Securities Exchange Act, Congress defined "security," § 3(a)(10), to include "any note" but inserted in the same clause that this would not include "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

It should be added that the definition sections of both statutes, § 2 of the 1933 Act and § 3 of the 1934 Act, begin with the words:

When used in this title, unless the context otherwise requires—

The sparse legislative history is analyzed in a Note, The Commercial Paper Market and the Securities Acts, 39 U.Chi.L.Rev. 362, 381–83, 397–98 (1972). The source of the registration exemption in § 3(a)(3) of the 1933 Act was a letter from the Secretary of the Federal Reserve Board to the Chairmen of the House and Senate Committees. The Board thought it apparent that the proposed act was

intended to apply only to stocks, bonds, debentures, and other similar securities of the kind commonly known as investment securities, which are issued for the purpose of obtaining capital funds for business enterprises and are purchased by persons for investment.

The amendment was suggested because it seemed to the Board that the Act was

not intended to apply to bankers' acceptances or to short-time paper issued for the purpose of obtaining funds for current transactions in commerce, industry, or agriculture and purchased by banks and corporations as a means of employing temporarily idle funds.[7]

Except for the prefatory language in § 2, the terms of the 1933 Act would thus have the result of subjecting to the anti-fraud provisions, in contrast to the registration requirements, any note, however short the term and however far the transaction was from being an investment security.[8]

When the 1934 Act was passed there was no need for a special exemption of notes from registration, since the registration requirement was tied to transactions on a national stock exchange, § 12(a).[9] If notes were to have special treatment beyond this, the place to accord this had therefore to be in the definition of a security. Apparently there was general agreement that something of this sort should be done. The backing and filling was on whether the exemption should contain the "current transaction" language of § 3(a)(3) of the 1933 Act; ultimately this was deleted. The author of the Chicago Law Review note seems correct in concluding:

Since there is no legislative comment with respect to this deletion, it cannot be gainfully surmised whether the omission of the "current transactions" phrasing was an inadvertent mistake, an assumption on the part of the legislature that the clause was unnecessary, or a conscious attempt to distinguish section 3(a)(10) of the 1934 Act from section 3(a)(3) of the 1933 Act.

Except for the prefatory language in § 3 the letter of the 1934 Act would thus have the result that any note with a maturity in excess of nine months would be subject to the antifraud provisions whereas any note with a shorter maturity would be exempt from them.[10]

---

**7.** Although the letters refer to "this bill," Hearings before the House Committee on Interstate Commerce, 73d Cong. 2d Sess. on H.R. 4314, p. 180 (1933), the amendment transmitted by the Federal Reserve Board dealt only with the registration requirement. The hearings brought forth considerable sentiment that compliance with registration requirements would cripple the entire commercial paper market; there was no claim that application of the anti-fraud provisions would impose a similar burden. The only remarks having any bearing on the applicability of the anti-fraud provisions were repeated assertions that banks and not the common investors who were the lambs to be protected by the bill were the almost universal purchasers of such paper. However, these remarks were in the context of the registration requirement—the portion of the 1933 Act that occupied the center of the stage.

**8.** This intention seems to be emphasized by the express declaration in § 17(c) of the 1933 Act that "The exemptions provided in section 3 shall not apply to the provisions of this section."

**9.** This situation was altered by the addition of § 12(g) in 1964, 78 Stat. 565, 566–68.

**10.** In the six federal securities acts, passages of four—the Securities Act of 1933, § 2(1); the Trust Indenture Act of 1939, § 303(1); the Investment Company Act of 1940, § 2(a)(36); the Investment Advisers Act of 1940, § 202(a)(18)—define a "security" as
   any note . . . evidence of indebtedness . . . investment contract . . . or, in general, any interest or instrument commonly known as a "security" . . . .
The Public Utility Holding Company Act of 1935, § 2(a)(16), uses the slightly different version,
   any note . . . investment contract . . . or, in general, any instrument commonly known as a "security" . . . .
Thus none of these five acts limits the application of its provisions as they relate to notes by limiting the definition of a "security," as does the 1934 Act's § 3(a)(10). However, with the exception of the Investment Adviser's Act, each provides an explicit exemption of some sort for activities in commercial paper. Besides the 1933 Act's § 3(a)(3) exemption from registration, quoted in the text above, § 6(b) of the Public Utilities Holding Company Act provides
   The provisions of subsection (a) of this section [making unlawful certain transactions

As will be seen, courts have shrunk from a literal reading that would extend the reach of the statutes beyond what could reasonably be thought to have been intended in these two great pieces of legislation and would produce a seemingly irrational difference in the scope of their anti-fraud provisions. A further basis for utilizing the "unless the context otherwise requires" phrase is found in President Roosevelt's messages urging enactment of both statutes and the Senate committee report on the 1933 Act, both of which reflect concern for the average investor against fraud in the public offering of common investment instruments. See Comment, Commercial Notes and Definition of 'Security' under Securities Exchange Act of 1934: A Note is a Note is a Note?, 52 Nebraska L.Rev. 478, 487–88 (1973).

This court's first encounter with the problem whether notes were to be considered as securities within the 1934 Act came in *Movielab, Inc. v. Berkey Photo, Inc.,* 452 F.2d 662 (2 Cir. 1971), affirming, 321 F.Supp. 806 (S.D.N.Y.1970). There one publicly held company, the defendant Berkey, had sold assets to another, the plaintiff

Movielab, allegedly through misrepresentations, for two 20-year installment 8% purchase notes, each in the amount of $5,250,-000 and a shorter term note of $4,178,312. Movielab sought rescission and damages. Plainly these were not "commercial" loans; Berkey was not in the business of making these, and the transaction was not functionally different than if Movielab had issued 20-year debentures. After pointing out in somewhat of an understatement that the definition "includes some notes at the very least", this court thought there could hardly be a clearer case for inclusion that "notes issued by one publicly owned company to another publicly owned company for $10,-500,000, payable over a period of 20 years, in exchange for the assets of the latter . . . ."

*Zeller, supra,* 476 F.2d at 798–801, was a somewhat closer case. The alleged "security" there was a demand note for $315,310 issued by a parent to a subsidiary to replace open account loans it had previously forced the subsidiary to make. In holding the note to come within § 3(a)(10) of the 1934 Act, we chose not to place our decision on the basis that a demand note is not within the

by registered companies] shall not apply to the issue, renewal, or guaranty by a registered holding company or subsidiary company thereof of a note or draft (including the pledge of any security as collateral therefor) if such note or draft (1) is not part of a public offering, (2) matures or is renewed for not more than nine months, exclusive of days of grace, after the date of such issue, renewal, or guaranty thereof, and (3) aggregates (together with all other than outstanding notes and drafts of a maturity of nine months or less, exclusive of days of grace, as to which such company is primarily or secondarily liable) not more than 5 per centum of the principal amount and par value of the other securities of such company then outstanding, or such greater per centum thereof as the Commission upon application may by order authorize as necessary or appropriate in the public interest or for the protection of investors or consumers. . . . *15 U.S.C.* § *79f(b).*

Section 304(a) of the Trust Indenture Act provides,

(a) The provisions of this subchapter [exempting securities and transactions] shall not apply to any of the following securities:

(1) any security other than (A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate . . . . 15 U.S.C. § 77ddd(a).

And § 3 of the Investment Company Act exempts, by declaring not to be an "investment company"

(3) Any bank or insurance company; any savings and loan association . . . . .

(5) Any person who is not engaged in the business of issuing redeemable securities, face-amount certificates of the installment type or periodic payment plan certificates, and who is primarily engaged in one or more of the following businesses: (A) Purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; (B) making loans to manufacturers, wholesalers, and retailers of, and to prospective purchasers of, specified merchandise, insurance, and services . . . . .

15 U.S.C. § 80a–3(c).

exception for notes with a maturity not exceeding nine months, see Securities Act Release No. 4412 (1961), even though on the facts "the maker of the note could prevent any demand by the holder and the note was outstanding for ten months." 476 F.2d at 799. We said rather, 476 F.2d at 800:

It does not follow, however, that every transaction within the introductory clause of § 10, which involves promissory notes, whether of less or more than nine months maturity, is within Rule 10b-5. The Act is for the protection of investors, and its provisions must be read accordingly. See *Movielab, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662 (2 Cir. 1971). But we see no reason to doubt that Belco stood in the position of an investor, although perhaps an involuntary one, with respect to Bogue.

Our opinion relied in considerable degree on Securities Act Release No. 4412, narrowly interpreting § 3(a)(3) of the 1933 Act, see 476 F.2d at 799, which we thought to have at least some application to the exemption in § 3(a)(10) of the 1934 Act. *Zeller* was followed and somewhat extended in *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 523–27 (5 Cir. 1974), which held that notes, some of which were to mature in less than 9 months, issued to reimburse dissatisfied customers of a brokerage firm were securities.[11] In *Zabriskie v. Lewis*, 507 F.2d 546, 550–52 (10 Cir. 1974), the court held § 10(b) to be applicable to an unsophisticated investor's purchase of short term notes, offered outside normal commercial circles, which promised a stratospheric interest return.

Nevertheless, the Fifth Circuit's oft-cited dictum in *Lehigh Valley Trust Co. v. Central Nat'l Bank of Jacksonville*, 409 F.2d 989, 991–92 (1969), that the "definition of a security has been literally read by the judiciary to the extent that almost all notes are held to be securities," has been considerably eroded, in part by that court itself. A contributing factor has been the first two sentences in the passage of our *Zeller* opinion, 476 F.2d at 800, quoted above.

The first blow by a court of appeals was struck in *Lino v. City Investing Co.*, 487 F.2d 689 (3 Cir. 1973). Lino had acquired two Franchise Sales Center Licensing Agreements from Franchise International (FI), a wholly-owned subsidiary of City Investing. This purchase, for cash and promissory notes of a term unspecified in the opinion, was allegedly the result of FI's fraud. Reversing the district court, the court of appeals, after referring to the "unless the context otherwise requires" clause, said, 487 F.2d at 694–95:

The commercial context of this case requires a holding that the transaction did not involve a "purchase" of securities. These were personal promissory notes issued by a private party. There was no public offering of the notes, and the issuer was the person claiming to be defrauded. The notes were not procured for speculation or investment, and there is no indication that FI was soliciting venture capital from Lino.[12]

As to the district court's reliance on *Movielab*, the court said, 487 F.2d at 695–96:

We are not faced with a situation such as confronted the *Movielab* court, and, in

---

11. Two important decisions by courts of appeals preceding *Zeller* are *Rekant v. Desser*, 425 F.2d 872 (5 Cir. 1970) (note, finally maturing in seven years but allegedly continually reduced by corporation's payments, issued by the corporation to insider in exchange for property held as security), and *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7 Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972) (sales by broker-dealer of short-term commercial paper of an issuer to 42 purchasers, some in small amounts, constituted sales of securities within § 3(a)(10) of 1934 Act).

12. Whether or not the *Lino* result was right, a point on which we express no opinion, we do not find some of this reasoning very persuasive. The anti-fraud provisions of the securities laws are not limited to public offerings and, as the opinion itself recognized, 487 F.2d at 694, they apply "when the fraud involves the thing given rather than the security received." While there surely was "no indication that FI was soliciting venture capital from Lino," the claim was rather that Lino was soliciting the means to start *his* business—specifically, training, various franchising programs which he was to market, and advertising—from FI.

any event we are not bound by that decision. We hold only that this particular transaction before us does not fall within the ambit of the federal securities law.[13]

Next came two Fifth Circuit cases holding that notes issued to obtain bank loans were not securities within the federal securities law. *Bellah v. First National Bank of Hereford,* 495 F.2d 1109 (5 Cir. 1974), involved a borrower's attempt to use § 10 of the 1934 Act and Rule 10b–5 in order to avoid a six-month note executed to renew indebtedness secured by a deed of trust on real estate that had come due. In rejecting this the court chose not to rely on the short term of the note but placed its decision on the ground that the note was (issued in the context of a commercial loan transaction.) Speaking through Judge Gewin, it expressed doubt that Congress intended by the securities laws "to render federal judges the guardians of all beguiled makers or payees." 495 F.2d 1114. This was followed in *McClure v. First Nat'l Bank of Lubbock,* 497 F.2d 490 (5 Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), in which plaintiff, half-owner of a corporation, unsuccessfully invoked the federal securities law to recover foreclosed corporate assets which had been pledged to secure a $200,000 one-year promissory note taken to obtain funds for the corporation but which, it was alleged, had been fraudulently borrowed from the corporation to repay the personal debts of the other half-owner to the lending bank.[14] In

*C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40, 44 U.S.L.W. 3201 (Oct. 6, 1975), the Seventh Circuit was confronted with the issue

> whether promissory notes delivered to a bank for loans used to purchase the assets of a small business enterprise constitute "securities" under the Securities Exchange Act of 1934, investing the maker of the notes with a jurisdictional basis for bringing suit in the federal courts.

In a thorough opinion which reviewed the pertinent court of appeals decisions, the court answered in the negative. Judge Sprecher recognized the difficulties of "the commercial-investment" dichotomy, saying, 508 F.2d at 1359:

> In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day. On the other hand, the polarized extremes are conceptually identifiable: buying shares of the common stock of a publicly-held corporation, where the impetus for the transaction comes from the person with the money, is an investment; borrowing money from a bank to finance the purchase of an automobile, where the impetus for the transaction comes from the person who needs the money, is a loan. In between is a gray area which, in the absence of fur-

13. The court, 487 F.2d 689 n.12, 696 n.15, cited *Rekant v. Desser, supra* note 11, but did not attempt to distinguish it beyond suggesting that "transactions involving a corporation's notes should be treated differently in some instances than similar transactions involving an individual's notes."

14. Judge Roney noted with candor, 497 F.2d at 494–95:

> We realize that our holding today that the Act does not apply to commercial notes of a longer duration than nine months, taken with the decisions voiding the short-term exemption as to investment paper, virtually writes that exemption out of the law. On one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the "any note" language of the

exemption. On the other hand, the Act does not cover any *commercial* notes, no matter how long their maturity, because they fall outside the "any note" definition of a security. Thus, the investment or commercial nature of a note entirely controls the applicability of the Act, depriving of all utility the exemption based on maturity-length. The original scrivener of the definitional section may well wonder what happened to his carefully drawn exemption on the way to the courthouse, but if the judicial decisions do not properly reflect the intent of Congress as to the coverage of the Act, only that body can properly rectify the situation at this point, if stare decisis is to apply and the Supreme Court does not make some definitive decision contrary to the presently decided cases.

ther congressional indication of intent or Supreme Court construction, has been and must be in the future subjected to (case-by-case) treatment.

He thought some help could be obtained by use of the criteria in 52 Nebraska L.Rev. at 510–24, cited above, and also referred to the conclusions reached in an article by two New York lawyers experienced in securities law which we quote in the margin.[15] The most recent court of appeals bank loan decision of which we are aware is *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9 Cir., decided March 22, 1976), CCH Fed.Sec. L.Rep. ¶ 95,494. The court held in a *per curiam* opinion that the note of a corporation given to a bank in exchange for a 10-month renewable line of credit was not a security within the meaning of the federal securities laws so as to sustain a suit by the bank against a controlling person for misrepresentations. In a concurring opinion enthusiastically cited by appellant, Judge Eugene Wright seems to suggest that in any case where a bank receives a note in what purports to be an exercise of its lending function, (the federal securities laws should not apply;) cf. *SEC v. Fifth Ave. Coach Lines, Inc.,* 289 F.Supp. 3 (S.D.N.Y. 1968), *aff'd on other grounds,* 435 F.2d 510 (2 Cir. 1970). In contrast to the typical "investment situation," Judge Wright argues, in which "the issuer has superior access to and control of information material to the investment decision", the commercial bank when negotiating a loan generally deals face-to-face with the promisor, "has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application. . . . [W]hile banks are subjected to risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a significantly different posture than the investors sought to be protected through the securities acts."

What makes Judge Wright's approach rather appealing is that the efforts to provide meaningful criteria for decision under "the commercial-investment" dichotomy do not seem to us to carry much promise of success. For example, we do not see much force in the test suggested by the *Great Western per curiam* "whether the funding party invested 'risk capital'." On the one hand, the securities laws cover debt, even supposedly gilt-edged debt, as well as equity; on the other a $5,000 "character" six months' bank loan to enable an old customer to enter a new line of business would scarcely qualify as a "security" although it is surely risk capital. Frequent reference is made to the test laid down by the Supreme Court in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), in defining what constitutes an "investment contract," namely, "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Although the Court has recently said that this "embodies the essential attributes that run through all of the Court's decisions defining a security," *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), the Court has not yet had the note problem before it, and the test seems to us to be of dubious value in that context. There was no "common enterprise" in *Movielab* unless a debt relationship suffices to create one; if it does, it would be hard to think of a situation where profits in the shape of interest

**15.** Lipton & Katz, "Notes" Are (Are Not?) Always Securities—A Review, 29 Bus.Lawyer, 861, 866 (1974):

Not every note is a security. The commercial context of the underlying transaction has to be evaluated. Notes issued for personal loans and consumer installment purchases are not securities. Notes that are issued for investments and business acquisitions as well as commercial paper sold outside the normal institutional market are securities. The middle ground has been narrowed, but will still from time to time create a problem. The courts have seen the impact of the open "floodgates" in other areas and should pay heed to the legislative intent and policy considerations discussed above. The federal securities laws are not the appropriate vehicle for consumer protection on installment sales. See also a postscript by the same authors, "Notes" Are Not Always Securities, 30 Bus. Lawyer 763 (1975).

are more dependent on the "efforts of others" than a bank's unsecured short-term personal loan to an individual, the very archetype of what the securities laws were not intended to cover. We see little relevance in a distinction between loans to an enterprise in formation and to one already established, especially if the former bear individual endorsements as they frequently do. While we could go on to develop the difficulties with other suggested "criteria" in the Nebraska Law Review comment, it suffices to observe that the authors themselves recognize that there is a good countervailing argument for nearly every one. Directing district courts to "weigh" a number of such dubious factors, without any instructions as to relative weights and with admonitions such as given by the *Great Western per curiam*,[16] is scarcely helpful to hard-pressed district judges or to counsel. Adoption of Judge Wright's view thus would afford the hope of bringing a modicum of certainty into one large section of a field in bad need of it.

Despite this we do not find ourselves able to accept Judge Wright's suggestion that no note given to evidence a bank loan can be a "security." One reason is that, in framing his exception, under the influence of the facts in the case in hand which are also present here, he seems to look at the matter solely, or at least principally, from the standpoint of a bank seeking to invoke the federal securities laws as a remedy supplementing those afforded by state laws. However, as shown by several of the cases cited, often it is the borrower who asserts fraud by the lender. Judge Wright's arguments based on a bank's superior bargaining position and its special investigatory facilities would have little bearing in such a case; indeed the former would weigh in favor of holding the note to be a security. Yet we see nothing in the statutes that would justify holding that the same note was a security when a borrower from a bank invoked federal law and not a security when the bank asserted this.[17] Even when it is the bank that invoked the federal securities laws, we would find it hard to reconcile with the statutory language a holding that where a bank or a group of banks loaned many millions of dollars to a corporation for periods of several years, the antifraud provisions of the federal securities laws do not apply. While banks are in a favored position to obtain disclosure, the target of §§ 10(b) of the 1934 Act and 17(a) of the 1933 Act is fraud, which a bank's ability to obtain disclosure cannot always prevent.

[redacted] The foregoing discussion suggests to us that, taking full account of the antiliteralist approach of the *Forman* opinion, 421 U.S. at 848–51, 95 S.Ct. 2051, the best alternative now available may lie in greater recourse to the statutory language. The 1934 Act says that the term "security" includes "any note . . . [excepting one] which has a maturity at the time of issuance of not exceeding nine months," and the 1933 Act says that the term means "any note" save for the registration exemption in § 3(a)(3). These are the plain terms of both acts, to be applied "unless the context otherwise requires." A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the antifraud provisions of the 1933 Act[18] has the

16. We do not hold that application of any single factor . . . compels us to affirm the judgment of the district court. Nor do we intimate that in a different case there would not be other factors to consider." *Great Western Bank & Trust v. Kotz, supra,* 532 F.2d at 1258, CCH Fed.Sec.L.Rep. at 99, 501.

17. Another problem concerns cases where notes issued to a bank are discounted or hypothecated; if they are not "securities" in the hands of the payee bank, how could they become so when held by a pledgee?

18. On the question whether § 17(a) of the 1933 Act provides a private civil remedy, see *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867–68 (2 Cir. 1968) (concurring opinion), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The Supreme Court has recently declined to express an opinion on this subject, see *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734 n.6, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and the situ-

burden of showing that "the context otherwise *requires*." (Emphasis supplied.) One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply.[19] We realize this approach does not afford complete certainty but it adheres more closely to the language of the statutes and it may be somewhat easier to apply then the weighing and balancing of recent decisions of sister circuits. A more desirable solution would be for Congress to change the exclusions to encompass "a note or other evidence of indebtedness issued in a mercantile transaction," as is proposed in the ALI's Federal Securities Code,[20] § 297(b)(3), and complement this by a grant of power to the SEC to explicate the quoted phrase by rule much as § 216A of the ALI Code does with respect to the exemption for commercial paper, see also § 301(1). So long as the statutes remain as they have been for over forty years, courts had better not depart from their words without strong support for the conviction that, under the authority vested in them by the "context" clause, they are doing what Congress wanted when they refuse to do what it said.

■ If ours is the correct approach, affirmance is clearly demanded—as it doubtless also would be by the "commercial-investment" dichotomy, although not, we suppose, by Judge Wright's *Great Western* concurrence. The Weis transaction is at the opposite pole from the typical "mercantile" transactions we have mentioned. The "loan" was negotiated with the Bank's chief administrative officer, not with a lending officer. The form of the note was dictated not by the Bank but directly by the borrower and ultimately by NYSE. The notes themselves bore scant resemblance to the standard forms used in commercial lending. While the notes purported to mature at dates ranging from 12 to 18 months from issuance, collection at the stated dates or later depended on the lender's giving six months' written notice. More important of all were the subordinated character of the notes and the knowledge of both parties that the proceeds would be considered by NYSE as the equivalent of equity capital for the purpose of enabling Weis further to expand its business by borrowing sums that would permit it to extend more credit to major customers. Transferability of the

ation in this Circuit remains unclear, see *Globus v. Law Research Service*, 418 F.2d 1276, 1283, cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), chiefly it may be, because generally there is "little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under 10(b) of the 1934 Act," and if it is established that a buyer does not have a 10(b) action this will usually suffice to defeat a § 17(a) claim which the court need only assume, *arguendo*, to exist. But see *Superintendent of Insurance v. Bankers Life & Co.*, 430 F.2d 355, 359 (1970), *rev'd on other grounds*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Two courts in the Southern District of New York have held against an implied right of action under § 17(a), see *Welch Foods v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, CCH Fed.Sec.L.Rep. ¶ 94,806 (1974); *Berger v.*

*Weis*, Dkt. No. 74 Civ. 186 (6/27/75) (unpublished opinion).

**19.** We leave for another day the status under the 1934 Act of a note with a maturity of nine months or less that does not bear such a strong family resemblance, and the question whether a note which because of its short term would not be a security under § 10(b) of the 1934 Act might be one within the anti-fraud provisions of the 1933 Act.

**20.** The Code removes the need for an exception from registration, such as is contained in § 3(a)(3) of the 1933 Act, by provision for a "limited offering" § 227 (with banks excluded from this section's numerical test), which is not a "distribution" subject to the Code's filing requirement, § 501.

notes was restricted to persons approved by NYSE and prepayment was prohibited without NYSE's consent. The notes reflected the Bank's foregoing of the usual and important rights to take as security any property of the borrower that came into its possession or to exercise a right of set-off. Finally, the Exchange National loan was no isolated transaction but a part of a large financing operation conducted by Weis' combining 19 lenders who held subordinated notes, debentures and cash agreements totalling $8,735,275, with another 24 lenders who had subordinated accounts or notes to which their accounts were subordinated. We find nothing in this "context" that would justify a failure to apply the statutory language and much that demands its application.

We are not called upon to decide, and intimate no opinion concerning, the question whether these notes, though not within the 1934 Act's exemption, are also outside the 1933 Act's exception from registration. Apart from minor differences in language—principally the requirement of the 1933 Act that exempted notes should reflect a current transaction, an elusive concept given the almost universal practice of continuous roll-over—the purposes of the registration and anti-fraud provisions differ, thus altering the "context" to be examined to determine whether the admonition "unless the context otherwise requires" is to be applied.

The order denying Touche's motion to dismiss on the ground that the notes were not "securities" within the federal securities laws is affirmed. It goes without saying that we have not passed on other defenses, notably the effect of the recent decision in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (1976), see note 2 *supra.*