972 F.2d 350
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Claude and Faye WRIGHT, Plaintiffs-Appellees,
v.
Thomas R. DOWNS, Defendant-Appellant.
 No. 91-2050.
 United States Court of Appeals, Sixth Circuit.
 July 17, 1992.
 
 Before KEITH and SUHRHEINRICH, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant-Appellant, Thomas R. Downs ("Downs") ("defendant"), appeals from a jury verdict and award in favor of appellees, Claude and Faye Wright (the "Wrights") ("plaintiffs") for security fraud in the amount of $230,000. On appeal, defendant contends that the notes at issue were not securities as defined in § 3(a)(10) of the 1934 Securities and Exchange Act. Additionally, defendant contends that the district court erred in denying its motion for Judgment Notwithstanding the Verdict. For the reasons stated below, we AFFIRM.
 
 I.
 
 2
 On January 24, 1987, Claude and Faye Wright invested $200,000 with Gilead Baptist Church located in Taylor, Michigan. In return, the plaintiffs received a mortgage note from the church in the amount of $200,000. The notes were promissory notes bearing interest at a rate of 15% and payable upon demand with notice. The notes were to be secured by a "second mortgage" on the Church's real property located in Taylor, Michigan.
 
 
 3
 The notes were offered during Church services by Pastor Jack Downs ("Pastor Downs") from the pulpit to all members of the Church, and to non-members as well. Church services were broadcast throughout the community on eight local cable television stations, and during a four year period, more than 200 investors purchased the notes.
 
 
 4
 Mr. Wright testified that he learned of the second mortgage notes from Pastor Downs during Church services, at which time Pastor Downs stated that there were "only a few more available." Mr. Wright contacted Sherrie Moravec about the mortgage notes, and she told plaintiff that she would contact him in two to three days. Upon calling Mr. Wright, Ms. Moravec allegedly stated that the mortgage notes were safe investments, that the Church had an outstanding balance of $800,000 on the first mortgage and that investment notes amounted to a $500,000 "second mortgage" on Church property. Thereupon, Sherrie Moravec scheduled a meeting between Mr. Wright and Pastor Down's son, defendant Downs.[1]
 
 
 5
 Mr. Wright testified that he met with Downs in early November 1987. Mr. Wright stated that Downs, at this meeting, told him that the Church had an outstanding balance of $800,000 on a first mortgage and that the investment notes represented $500,000 in "second mortgages" against total church assets of $5.5 million to $6 million. Downs, at trial, contended that the meeting never took place.
 
 
 6
 The Wrights, who had invested in certain notes offered by the Church in the past, all of which had been promptly paid by the Church, decided to roll over an existing $75,000 note and invest $125,000 more.[2] According to Mr. Wright, he believed that the $200,000 investment was secured by a single $500,000 second mortgage on the Church's property. Mr. Wright also stated that he was told by Downs that the Church had a $1,000,000 insurance policy.
 
 
 7
 On April 1, 1988, the Church stopped paying interest on the Wrights' investment. Thereafter, Mr. Wright investigated the finances of the Church and discovered that his supposed "second mortgage" was in fact one of a series of second mortgages issued by the Church. In fact, the outstanding indebtedness of the Church, as represented by the mortgage notes, exceeded $5 million, and the value of the Church was $2 million or less.
 
 
 8
 On March 30, 1990, defendants filed a motion for summary judgment claiming that the notes at issue were not "securities" for purposes of the securities laws. On May 9, 1990, the district court ruled that the notes were securities and denied that portion of the summary judgment motion.
 
 
 9
 On May 17, 1991, the jury returned a verdict in favor of the Wrights in the amount of $230,000, against Downs, and Jack Downs and Sherrie Moravec.[3] On June 3, 1991, defendant filed a motion for judgment notwithstanding the verdict. On August 7, 1991, the motion for JNOV was denied. This timely appeal followed.
 
 II.
 
 10
 The threshold issue in the instant case is whether the notes sold by Downs are securities within the meaning of the Securities and Exchange Acts of 1933 and 1934.[4] In Reves v. Ernst & Young, 494 U.S. 56 (1991), the Supreme Court adopted the "family resemblance" test as the general framework for deciding when a "note" satisfies the statutory definition of a "security." Under this analysis, there is a presumption that the "note" is a "security" unless: 1) the note bears a strong resemblance, in terms of the four factors considered in the Reves decision, to one of the Second Circuit's already-enumerated categories of non-securities, or 2) consideration of the same four factors shows that the note should be added to the list of non-securities. Id. at 952. The four factors bearing upon an instrument's status as a security or non-security are the motivations of the buyer and seller in exchanging the instruments, the instrument's plan of distribution, the reasonable expectations of the investing public, and the existence of some other regulatory scheme that significantly reduces the risk of the instrument. Id. at 951-952.
 
 
 11
 Defendant asserts that the mortgage notes at issue should be exempted from the Securities Acts because they strongly resemble the "family of notes" identified by the Second Circuit and adopted by the Supreme Court as falling outside the definition of security. See, e.g., Exchange Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1137 (2nd Cir.1976). Defendant claims that the notes in the instance case resemble "the note secured by a mortgage on a home," and "the short term note secured by a lien on a small business or some of its assets," or "a note which simply formalizes an open account debt incurred in the ordinary course of business" which is collateralized. Alternatively, defendant argues that the mortgage notes are of such a nature to require their being identified as an additional instrument that should be identified as a non-security.
 
 
 12
 Applying the "family resemblance" test to the notes, it is clear that the "notes" are "securities." As to the first factor--motivation--the Wrights clearly purchased the note "in order to earn a profit in the form of interest." Reves, 494 U.S. at 68, 69. As the Co-Op in Reves, the Church sold the notes in order to raise capital for general operations and to develop the mobile home retirement park in Florida. Id. The Wrights, in turn, purchased the notes to earn 15% interest, a rate far in excess for that available on a certificate of deposit. Thus, "[f]rom both sides, then, the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." Id. at 68.
 
 
 13
 Secondly, the Reves Court directs this Court to examine the "plan of distribution" of the instrument to determine whether it is an instrument in which there is "common trading for speculation or investment." Id. at 66. The Supreme Court has held that this element is satisfied if the notes were "offered and sold to a broad segment of the public...." Id. (citing Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985)) (citations omitted). In this case, there was common trading to a broad public segment; the notes were offered to all Church members from the pulpit, as well as broadcast throughout the community on eight local cable television stations. Over a four year period, more than 200 people purchased the notes in which there were no restrictions as to purchasers. Indeed, the purchasers included non-members of the Church.[5]
 
 
 14
 The third factor--the reasonable expectations of the investing public--also supports the conclusion that the notes were "securities." The Church actively solicited the notes to the public, with a high rate of interests. The public's expectation was to earn a profit. Clearly, these notes were seen by the public as investments rather than loans.
 
 
 15
 Finally, the fourth factor is whether some regulatory scheme exists to reduce the risk of the investment. Michigan laws concerning the recording of deeds and mortgages are certainly not the type of regulation the Supreme Court had in mind. Because there are no comprehensive regulations such as the Federal Banking Laws, or the Employee Retirement Income Security Act of 1974, "the notes here would escape federal regulation entirely if the Acts were held not to apply." Id. at 69.
 
 
 16
 Therefore, we find that defendant fails to rebut the presumption of the "family resemblance" test given the fact that the notes do not resemble any of the non-securities enumerated in the Second Circuit and adopted by the Supreme Court in Reves. Nor does an examination of the four factors to the test indicate that the notes should be added to the list of non-securities, despite their lack of resemblance. Looking at the "economic reality" as guided by Reves, these were pure investments.
 
 
 17
 In consideration of the above, we hold that the notes at issue here are within the term "note" in § 3(a)(10) of the Securities and Exchange Act of 1934.
 
 III.
 
 18
 Because we find that these "notes" are "securities" as defined in § 3(a)(10) of the 1934 Securities and Exchange Act, we must entertain defendant's assignment of errors regarding the jury verdict. Defendant argues that there was insufficient evidence to support the jury verdict finding him guilty of violating the security laws, and, therefore, the district court incorrectly denied his motion for judgment notwithstanding the verdict.
 
 
 19
 (a)
 
 
 20
 The issue raised by a motion for a judgment notwithstanding the verdict is whether there is sufficient evidence to raise a question of fact for the jury. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. This Court, when reviewing the trial court's decision, is bound by the same standard. Ratliff v. Wellington Exempted Village Schools Bd. of Ed., 820 F.2d 792, 795 (6th Cir.1987).
 
 
 21
 (b)
 
 
 22
 Defendant argues that the evidence adduced at trial by plaintiff was insufficient to establish a § 10b-5 violation. Specifically, defendant argues that plaintiffs failed to offer sufficient evidence that: (1) Downs used any instrumentality of interstate commerce, the mails, or telephone, in communication with the Wrights, (2) Thomas R. Downs acted knowingly, and (3) the Wrights justifiably relied upon the Thomas R. Downs' conduct.
 
 
 23
 As it relates to the first element of a § 10b-5 claim, defendant contends that no evidence was presented at trial showing that he used any instrumentality of interstate commerce. Under § 10b-5, however, a defendant does not have to personally use the mails or interstate commerce to be liable for a security violation. Harris v. Equitable Life Assurance Society, 435 F.Supp 281 (W.D.Mich.1977). Indeed, it is sufficient to implicate another defendant who did not directly use any instrument of interstate commerce but nevertheless participated in the transaction if the use is by one defendant of an instrument of interstate commerce. Id. at 284.
 
 
 24
 Here, Mr. Wright testified that he telephoned Sherrie Moravec concerning the possibility of arranging a meeting to discuss purchasing mortgage notes. Ms. Moravec told Mr. Wright that she would telephone him in two to three days with more information regarding the mortgage notes. Upon calling, Mr. Wright testified that Ms. Moravec advised him that the church assets were between $5.5 million and $6 million and that the first mortgage was at $800,000 and the second mortgage note was at $500,000. Moreover, Ms. Moravec arranged a meeting between defendant and Mr. Wright. We find that Ms. Moravec's use of the telephone to arrange the meeting between defendant and Mr. Wright is sufficient to establish use of an instrumentality of interstate commerce.
 
 
 25
 The next element of a § 10b-5 claim for which defendant contests the sufficiency of the evidence is whether defendant acted knowingly. This element can be shown either by actual knowledge or recklessness. Ohio Drill & Tool Co. v. Johnson, 625 F.2d 738, 741 (6th Cir.1980). Recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Id.
 
 
 26
 In the instant case, defendant assumed his father's duties in the Church in January 1987. At trial, Downs testified that he solicited investments from the pulpit without any knowledge or regard to the state of the Church's finances. Yet, according to Mr. Wright's testimony, Downs, nonetheless, assured him that this was a safe investment as it would be backed by a second mortgage, and the Church's finances were in good shape. Because defendant had no knowledge of the Church's finances, yet continued to solicit investments, we can only conclude that reasonable minds can differ as to whether he acted recklessly, and thus knowingly for § 10b-5 purposes.
 
 
 27
 The final element contested by defendant in regards to the § 10b-5 violation is that of justifiable reliance. At trial, Mr. Wright testified that he consulted with Downs about the safety of the investment. According to Mr. Wright's testimony, Downs assured him that the Church was financially sound. In fact, Mr. Wright testified that he was told that the Church's had assets exceeding $5.5 million and debt in the form of a $800,000 first mortgage and $500,000 second mortgage. Additionally, Mr. Wright testified, although Mr. Downs contradicted this testimony, that he was shown bank statements and information regarding the first mortgage. Consequently, we conclude that evidence was presented upon which reasonable minds could differ and there was sufficient evidence to support the jury verdict.
 
 IV.
 
 28
 Defendant contends also that there was insufficient evidence to prove that he violated 15 U.S.C. § 771(2) ("s 12(2)"). Defendant argues that plaintiffs failed to show any evidence of (1) use of an instrumentality of interstate commerce in connection with the transaction, (2) defendant's knowledge of or lack of reasonable diligence to discover the untruths or omissions, and (3) that ample evidence existed that the Wrights knew of or had reason to know of the untruths or omissions.
 
 
 29
 As mentioned above, Ms. Moravec's use of the telephone to arrange the meeting between defendant and Mr. Wright sufficiently demonstrates use of an instrumentality of interstate commerce. Therefore, we must only determine whether there was sufficient evidence adduced at trial by which reasonable minds could differ as to the other elements necessary for a § 12(2) violation.
 
 
 30
 We find no merit to defendant's contention that plaintiffs failed to show any evidence of defendant's knowledge or lack of reasonable diligence to discover the untruths or omissions. Negligent conduct by the defendant is sufficient to satisfy this element. Wachovia Bank & Trust Co. v. National Student Marketing Corp., 650 F.2d 342, 356 (D.C.Cir.1980), cert. denied, 452 U.S. 954 (1981); Wertheim & Co. v. Codding Embryological Sciences, Inc., 620 F.2d 764, 767 (10th Cir.1980). Downs testified that when he sold Mr. Wright the notes, Downs was unaware of the Church's financial condition, although this information was kept in the Church's office. Thus, reasonable minds could conclude that Downs' conduct was negligent in failing to discover the untruth or omission which led the Wrights to invest in the Church.
 
 
 31
 Next, defendant asserts that insufficient evidence was produced to show that plaintiffs did not know of the untruth or omission. Defendant focuses on the fact that Mr. Wright knew that the Church had sold other second mortgages because Mr. Wright heard Jack Downs state that only a few notes remained available. Defendant, however, misses the point. The plaintiffs are not trying to suggest that they did not know there were other second mortgages, rather, they are stressing the fact that over $5 million in second mortgages had been sold although they were lead to believe this figure amounted to a total of $500,000. Thus, we find no merit to defendant's claim.
 
 V.
 
 32
 Defendant finally asserts that the finding that he violated Michigan Uniform Securities law, Michigan Compiled Laws Annotated 451.810 ("s 410(a)(2)"), was not supported by the evidence. Defendant argues that plaintiffs failed to introduce evidence that they did not know of any alleged untruth or omission in the exercise of reasonable care or that they could not have learned of the untruth or omission. We disagree. Mr. Wright engaged in past investments with the Church that had been timely repaid. Moreover, Mr. Wright arranged a meeting during which the Church finances were discussed, although misleadingly. Based on the facts, we can only conclude that reasonable minds could differ based on the evidence adduced at trial, but there was sufficient evidence to support the jury verdict.
 
 VII.
 
 33
 For the reasons stated above, we AFFIRM the jury verdict and award of the Honorable George E. Woods, United States District Judge for the Eastern District of Michigan.
 
 
 
 [1]
 By this time, Thomas R. Downs had become senior pastor of the Church
 
 
 [2]
 The deal was consummated on January 24, 1987
 
 
 [3]
 Thomas Downs, the sole appellant, has appealed the verdict only with respect to the claims of the Wrights although the jury also awarded Mr. and Mrs. Guthrie $34,500
 
 
 [4]
 The Supreme Court has consistently held that "[t]he definition of a security in § 3(a)(10) of the 1934 Act ... is virtually identical [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same." Reves v. Ernst & Young, 494 U.S. 56 (1990) (quoting United Housing Foundation, Inc. v. Formas, 421 U.S. 837, 847, n. 12 (1975))
 
 
 [5]
 For instance, Faye Wright was a member of Gilead Baptist Church, but Mr. Wright was not