**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 4, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff – Appellee,

v.

RALPH W. THOMPSON, JR.,

     Defendant – Appellant,

and

ROBERT CASEY HALL; US
VENTURES, a Utah limited liability
company; ROBERT L. HOLLOWAY;
DUANE C. JOHNSON;
ONLINE STRATEGIES GROUP, a
Delaware corporation; RCH2, a Utah
limited liability company; DAVID
STORY; ERIC J. WHEELER;
US VENTURES INTERNATIONAL, a
Utah limited liability company,

     Defendants.

No. 11-4182

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CV-00235-TC-BCW)**

Catherine A. Broderick, Senior Appellate Counsel, Securities and Exchange Commission
(Mark D. Cahn, General Counsel; Michael A. Conley, Deputy General Counsel; Jacob H.

Stillman, Solicitor; and Susan S. McDonald, Senior Litigation Counsel, with her on the brief), Washington, D.C., for Plaintiff-Appellee.

John J.E. Markham, II, Markham & Read, Boston, Massachusetts, for Defendant-Appellant.

Before **KELLY**, **BALDOCK**, and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

This appeal arises out of a civil-enforcement action brought by the Securities and Exchange Commission ("SEC") against Defendant-Appellant Ralph W. Thompson, Jr., in connection with an alleged Ponzi scheme Thompson ran through his company, Novus Technologies, L.L.C. ("Novus"). The district court granted summary judgment in the SEC's favor on several issues, including the issue of whether the instruments Novus sold investors were "securities," as that term is defined under the Securities Act of 1933 and the Securities Exchange Act of 1934 (collectively, the "Securities Acts").

Thompson's sole claim on appeal is that the district court ignored genuine disputes of material fact on the issue of whether the Novus instruments were securities, and that he was entitled to have a jury make that determination. We conclude, under the test articulated by the Supreme Court in Reves v. Ernst & Young, 494 U.S. 56 (1990), that the district court correctly found that the instruments Thompson sold were securities as a matter of law. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

# BACKGROUND

## I.    Factual background[1]

Sometime in 2000, Appellant Thompson founded Novus as a vehicle for his business ventures in China and elsewhere across the globe.  According to Thompson, by 2005, his connections in China had yielded some lucrative business opportunities.  Thompson's most promising prospect involved selling a quantity of biodiesel reactors to a Chinese company at a substantial profit.  But before Thompson could cash in, he needed to raise $12 million to facilitate that transaction.  In fact, each of Thompson's prospects in China required significant capital, of which Thompson had none.

By 2006, however, Thompson had attracted the attention of a partner, Duane C. Johnson,[2] who "had some borrowing power."  Aplt. App. at 136.  They began to "set about finding ways to obtain money to fund the China office for these projects."  Id. at 137.  Their search ultimately led them to the doorstep of Robert Holloway, who told the pair about a proprietary algorithm he had developed for trading on the S&P 500.  Holloway explained that his algorithm enabled him to guarantee his investors minimum

---

[1] All of the following facts are drawn from Thompson's deposition, Thompson's sworn Declaration in Opposition to the SEC's Motion for Summary Judgment, transcripts of seminars Thompson personally delivered, and documents and websites Novus used in connection with the instruments at issue in this case.  That is to say, because this appeal comes to us from a grant of summary judgment, we include only facts that Thompson, as the non-movant, does not dispute.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

[2] Johnson was also sued by the SEC as a coconspirator in this case, but he does not join Thompson in this appeal.

monthly returns of five percent on their investment, but that his investors sometimes received as much as forty percent per month. Holloway conducted a real-time demonstration of the algorithm for Thompson and Johnson, and as they watched the gains "occurring on his screen," they became believers. Id. at 141.

Thompson and Johnson's enthusiasm about Holloway's program piqued after they spoke with one of Holloway's investors, Casey Hall, who told them he had already successfully invested millions with Holloway. Hall also told Thompson and Johnson about his own real-estate based investment program, which guaranteed investors an even more enticing ten percent monthly return. At Hall's suggestion, Thompson and Johnson obtained $360,000 in investment capital through Chase Bank's small business loan program, and the two began—through Novus—to invest in both ventures. Later, Novus would also invest in yet another alleged real-estate program, Emma Golding's "Calypso," which promised staggering monthly returns of fifteen percent on investment.[3]

Attracted by the prospect of such impressive returns, "friends and family" began to inquire with Thompson and Johnson about participating in these programs, and the two

---

[3] Not surprisingly, each of the eye-popping "programs" run by Holloway, Hall, and Golding would later be exposed as Ponzi schemes. See generally In re Hedged-Investments Assocs., Inc., 48 F.3d 470, 471 n.2 (10th Cir. 1995) (describing a "Ponzi" scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments," and usually attracting investors by promising them "large returns for their investments"). Thompson insists that he "did believe [making such impressive returns] was possible at the time," and he stresses that "large numbers of persons have been burned like we have been by Ponzi schemes." Aplt. App. at 166.

approached Hall about involving other investors. However, Hall, unwilling to "deal with a lot of people's money," insisted that Thompson acquire "loans" from "anyone interested" and invest the proceeds with Hall through Novus. Aplt. App. at 167. Holloway insisted on the same arrangement. Eager to "grow a reserve toward the $12 [m]illion needed to fund the China [b]iodiesel project," id., Thompson undertook, through Novus, to borrow money to invest with Hall, Holloway, and later, Calypso, and by September 2006, Novus had begun transacting in the instruments at the heart of this appeal.

### i.     The "loan" instruments

The boilerplate "UNSECURED PROMISSORY NOTE" (the "Instrument"), which governed the majority of the transactions between Novus and its "lenders" (the "holders"), stated in relevant part that Novus "promise[d] to [re]pay" the principal amount (Novus required a minimum "loan" of $100,000) after a term of six months, plus monthly interest of between three and five percent, depending upon whether the holder chose monthly payments or a lump sum at maturity. Id. at 246. The Instrument also stated the following:

> It is expressly understood between the parties that the Borrower shall be using proceeds from the Note for further investments and it may not be financially prudent because of the market conditions to pay the principal at the end of the Note term. Therefore, Borrower shall have the option to extend the term of the Note for a period of 6 months as long as the monthly interest payments on the unpaid principal are made on a timely basis.

5

Id. (emphasis added). Finally, the Instrument stated on its face that it was not a security, and it bore features such as acceleration conditions, a waiver-of-presentment clause, a non-assignment clause, an attorney-fee-collection clause.[4]

### ii. Marketing and selling the Instruments

According to Thompson, the Instrument was "not offered publicly all at once," Aplt. Br. at 5, and "what [he] told prospective lenders varied as time passed and as our

[4] On the advice of counsel, around February 2007, Novus re-labeled the Instrument a "JOINT VENTURE AGREEMENT" and altered many of its terms, including requiring (1) that the party advancing money to Novus was "an accredited investor, as defined as such by law, or a sophisticated investor," Aplt. App. at 316, and (2) that the lending party "ha[d] sufficient business and/or investment experience to enter into this Agreement as a joint venture participant . . . ." Id. at 313. The joint venture agreement did not contain the statement that holders' funds would be used for further investments, but it repeatedly characterized the transaction's purpose as generating opportunities for "return on investment," albeit through the provision of "additional working capital" for "expansion of [Novus's] core business." Id. at 312-15 (representing also that Novus would "use . . . the joint venture working capital . . . in a manner that shall be in full compliance with . . . all banking and securities acts . . ."). The joint venture agreement contained no "fixed term," but only a minimum term of six months, after which the "Agreement shall be ongoing, at the pleasure and agreement of the Parties." Id. at 314.

At the summary judgment hearing before the district court, Thompson's counsel conceded that "there [was] no difference between the joint venture [agreement] and the [unsecured promissory] note. . . . [The joint venture agreement is] a note . . . just gussied up with a different form." Supp. App. at 424. Throughout his briefs, Thompson refers to both instruments collectively as the "Novus notes" or "Novus loans," and offers virtually no legal argument as to how the change should affect our analysis. Accordingly, and because Thompson never argues that Novus changed anything about its business practices (e.g., by actually vetting potential holders' accreditation status) after moving to the joint venture agreement, this opinion's references to the "Instrument" generally encompass transactions involving both the unsecured promissory note and the joint venture agreement, unless otherwise indicated.

6

company evolved," Supp. App. at 321. At first, Thompson simply "ma[de] referrals" to his "friends and family" so that they could take out small business loans, as he had, from Chase Bank. Id. at 213. But in so doing, Thompson would "make them aware of the money they could earn . . . how [Thompson] was earning money." Id. Eventually, Hall agreed to accept the proceeds of "loans" between Novus and Instrument holders, and so early holders "loaned funds to Novus and then [Thompson] loaned them to Casey Hall." Id. at 230. Thompson told these early holders "the type of business that [he] was doing and what the money was used for." Id. at 231. As "more and more people were interested in the loan program . . . [Thompson and Johnson] decided to turn [the Instruments] into more of a business." Id. at 236.

As Novus grew, Thompson fielded conference sales calls set up by a third party; he offered existing holders referral fees; he began to advertise the Instruments on Novus's web site; and by February 2007, he had begun personally touting the Instruments at shopping-mall seminars, where he would explain to prospective holders how they could liquidate equity in their homes and invest in the Instrument, which he "characterized . . . as low risk," Supp. App. at 262: he claimed that Novus's product was "more conservative than a 401(k) [or a] mortgage," Aplt. App. at 458, extoled Novus's "reserve of cash and assets to cover any money that we borrow for six months," id. at 479-80, and asserted that "when you put $100,000 into our program, we only use $25,000 of that" for core-business "projects"; "[t]he other $75,000," he claimed, "we don't use," id. at 479.

7

### iii. The SEC intervenes

On April 11, 2007, the SEC curtailed Novus's activities when it filed a civil complaint and obtained a temporary restraining order against Novus, Thompson, Hall, Holloway, and others. All told, before the SEC shut it down, Novus made a total of 138 of its "loans" to around sixty holders.

## II. Procedural background

After filing suit against Thompson and others under several civil-enforcement provisions of the Securities Acts, including 15 U.S.C. §§ 77q(a)(1)-(3), 78j(b), 77e(a) & (c), and 780(a), the SEC filed a motion for summary judgment, which the district court granted in part and denied in part. As is relevant here, the district court granted the SEC's motion on the issue of whether the Instruments Thompson and Novus sold were securities as defined under the Securities Acts, holding that they were securities as both "notes" under Reves v. Earnst & Young, 494 U.S. 56 (1990), and "investment contracts" under SEC v. W.J. Howey Co., 328 U.S. 293 (1946). Thompson timely filed this appeal, in which he argues only that the district court erred when it granted summary judgment on the issue of whether the Instruments Novus sold were securities.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making that determination, a

court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." Garrison, 428 F.3d at 935 (quoting Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999)).

Even though we view the evidence in the nonmovant's favor, however, a factual dispute cannot be said to be "genuine" if the nonmovant can do no more than "simply show that there is some metaphysical doubt as to the material facts." Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1084 (10th Cir. 2006); accord Rice v. United States, 166 F.3d 1088, 1092 (10th Cir. 1999) ("To carry his burden, [the non-movant] must present more than a scintilla of evidence."). That is to say, we will uphold a district court's grant of summary judgment if the evidence is "so one-sided that one party must prevail as a matter of law." Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1179 (10th Cir. 2007) (quoting Bingaman v. Kan. City Power & Light Co., 1 F.3d 976, 980-81 (10th Cir. 1993)).

As is especially relevant here, a court's "genuineness" review "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In other words, "an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable [factfinder] could find in favor of the nonmovant." Planned Parenthood of the Rocky Mountains Servs. v. Owens, 287 F.3d 910, 916 (10th Cir. 2002). This means that once the movant has made a showing that there is no genuine dispute of material fact, the

9

non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"In the absence of a genuine dispute of material fact, we determine whether the district court correctly applied the substantive law." Owens, 287 F.3d at 916.

## DISCUSSION

### A. The broad definition of "security" under the Securities Acts

In response to "serious abuses in a largely unregulated securities market," Reves, 494 U.S. at 60, Congress enacted the Securities Acts "to restore investors' confidence in the financial markets," Marine Bank v. Weaver, 455 U.S. 551, 555 (1982) (discussing specifically the '34 Act). To meet that end, Congress "painted with a broad brush" in defining "security," so as to capture under the ambit of the Acts the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Reves, 494 U.S. at 62 (internal quotation marks omitted) (citing W.J. Howey Co., 328 U.S. at 299). Section 2(1) of the Securities Act of 1933 thus defines "security" in broad and general terms as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national

10

securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscript to or purchase, any of the foregoing.

48 Stat. 74, as amended, 15 U.S.C. § 77b(a)(1).[5]

In line with Congress's broad regulatory aims, courts inquiring into an instrument's status as a "security" are not "bound by legal formalisms," but instead must "take account of the economics of the transaction under investigation" in order to capture and effectuate the regulation of "investments, in whatever form they are made and by whatever name they are called." Reves, 494 U.S. at 61 (citing Tcherepnin v. Knight, 389 U.S. 332, 336 (1967)). Indeed, "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin, 389 U.S. at 336.

However, the Supreme Court has cautioned that, in enacting the securities laws, "Congress . . . did not intend to provide a broad federal remedy for all fraud." Marine Bank, 455 U.S. at 556 (emphasis added). Reflecting that principle, Congress tempered its broad definition of "security" under the Acts with an exception applicable to short-term

---

[5] The Supreme Court has "repeatedly ruled that the definitions of 'security' in § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act are virtually identical," and should be treated as such in decisions dealing with the scope of the term. Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 n.1 (1985) (citing Marine Bank, 455 U.S. at 555 n.3 (1982)); compare 15 U.S.C. §§ 77b(a)(1) & 77c(3) with 15 U.S.C. § 78c(a)(10). We "therefore . . . refer to cases involving the 1933 and 1934 Acts without distinguishing between which Act each case involved." Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1538 n.3 (10th Cir. 1993).

11

notes.[6]  Similarly, the Supreme Court has held that "the phrase 'any note' [as it appears in the Securities Acts] should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts."  Reves, 494 U.S. at 63.  Accordingly, in Reves, the Court articulated a test to enable courts to discern "notes issued in an investment context (which are 'securities') from notes issued in a commercial or consumer context (which are not)."  Id.  It is to that test that we now turn to determine whether the Instruments issued by Novus—which are akin to notes in some respects—were securities.

## B.  Reves's "family resemblance" test

In Reves v. Ernst & Young, the Supreme Court resolved a circuit split on the proper approach to ascertaining whether a "note" is a security under the Securities Acts.  494 U.S. at 64-65.  The Court adopted a version of the Second Circuit's "family resemblance" test, under which

---

[6] The form of the short-term-note exception varies slightly between the two Securities Acts, although both purport to exclude from coverage "any note, draft, bill of exchange, or banker's acceptance . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."  Compare 15 U.S.C. § 78c(10) ('34 Act) (including that language within the definition of the term "security" itself), with 15 U.S.C. § 77c(3) ('33 Act) (including that language in a separate registration exemption).  We have previously recognized that the short-term note exceptions are "limited to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public."  Holloway v. Peat, Marwick, Mitchell & Co., 900 F.2d 1485, 1489 (10th Cir. 1990).  Thompson appropriately does not argue that the Novus Instruments, which were not "prime quality commercial paper," fall outside the Acts' regulatory ambit on the basis of the short-term-note exception.

12

[a] note is <u>presumed</u> to be a "security,"[7] and that presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the . . . categories of instrument [identified by the Second Circuit in

---

[7] The Court in <u>Reves</u> explicitly left open whether the presumption that a note is a security applies to notes that mature in less than nine months. <u>Reves</u>, 494 U.S. at 65 n.3. Specifically, the Court recognized that under the Second Circuit's version of the family resemblance test,

> No presumption of any kind attached to notes of less than nine months' duration. The Second Circuit's refusal to extend the presumption to <u>all</u> notes was apparently founded on its interpretation of the statutory exception for notes with a maturity of nine months or less. Because we do not reach the question of how to interpret that exception, . . . we likewise express no view on how that exception might affect the presumption that a note is a "security."

<u>Id.</u> After the Court decided <u>Reves</u>, we suggested in <u>Holloway v. Peat, Marwick, Mitchell & Co.</u>, that the presumption <u>does</u> apply to notes maturing in less than nine months. 900 F.2d 1485, 1488-89 (10th Cir. 1990) (observing that "<u>[e]ven if an issuer cannot rebut the presumption</u> that a note is a security under the family resemblance test, <u>the note may still be excluded from coverage of the Acts if it 'has a maturity at the time of issuance of not exceeding nine months</u>,'" and reaffirming that the "exception for short-term notes is limited to prime quality negotiable commercial paper" (emphases added)); <u>accord</u> <u>S.E.C. v. R.G. Reynolds Enters., Inc.</u>, 952 F.2d 1125, 1132 (9th Cir. 1991) (limiting the short-term note exception to "commercial paper and hold[ing] that the presumption that a note is a security applies equally to notes of less than nine months maturity that are not commercial paper").

In this case, Thompson makes no arguments about how the Instruments' 6-month term might affect application of the presumption. <u>See</u> Aplt. Br. at 32 (arguing only that "courts are generally inclined to <u>look more closely</u> at notes maturing in less than nine months and are less inclined to automatically label them as securities" (emphasis added)). Perhaps this is because the Novus Instruments allowed Novus to extend the term for an additional six months at its own discretion. <u>See</u> 15 U.S.C. § 78c(a)(10) (excluding from coverage "any note . . . which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof . . . which is likewise limited"). In any event, because Thompson appears to accept that the presumption applies to Novus's Instruments, we address that issue no further.

13

the case of <u>Exchange Nat'l Bank of Chicago v. Touche Ross & Co.</u>, 544 F.2d 1126, 1137 (2d Cir. 1976)].

<u>Id.</u> at 67 (emphasis added).  The categories of instrument enumerated by the Second Circuit which are <u>not</u> securities include

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] . . . notes evidencing loans by commercial banks for current operations.

<u>Id.</u> at 65 (quoting <u>Exchange Nat'l Bank of Chicago</u>, 544 F.2d at 1137, and <u>Chemical Bank v. Arthur Andersen & Co.</u>, 726 F.2d 930, 939 (2d Cir. 1984)).

To provide guidance to courts considering whether an instrument "bears a strong resemblance" to the instruments on the list, the Court prescribed application of the following four factors: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument," with an eye on "whether it is an instrument in which there is common trading for speculation or investment"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."  <u>Id.</u> at 66-67 (internal quotation marks omitted).  "Failure to satisfy one of the factors is not dispositive; they are considered as a whole."  <u>S.E.C. v. Wallenbrock,</u>

14

313 F.3d 532, 537 (9th Cir. 2002); accord Stone, 998 F.2d at 1539 (concluding that, "on balance" of the family-resemblance factors, the notes were not securities).

The Court instructed that if application of Reves's four factors "leads to the conclusion that an instrument is not sufficiently similar to an item on the list," the analyzing court must then decide "whether another category should be added . . . by examining the same factors." Reves, 494 U.S. at 67. As the Court did in Reves, we have conceived of this analysis as comprised of two separate steps. See Holloway, 900 F.2d at 1487. However, "both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry." Wallenbrock, 313 F.3d at 537; accord Stone, 998 F.2d at 1538-39 (treating the two steps as a single inquiry designed to facilitate the determination of whether the subject instrument's "'family resemblance' to [the enumerated] notes is sufficiently strong to cause [the subject instrument] to be included within the categories of notes that are not regarded as securities"). We construct our family-resemblance inquiry into the "securities" status of the Novus Instruments, then, around a single balancing of Reves's four factors, but stressing that those four factors only are directed toward assisting in a determination whether the Instruments in question are similar (or bear a family resemblance) to the types of "notes" enumerated by the Second Circuit in Exchange Nat'l Bank of Chicago, 544 F.2d at 1137, and Chemical Bank, 726 F.2d at 939.

15

Before we turn to apply the Reves factors in this case, however, we pause to address two additional points pertaining to the nature of Reves's family-resemblance inquiry generally, and at the summary judgment stage in particular.

First, Thompson repeatedly claims that he is entitled to have a jury make the ultimate determination under the family-resemblance test as to whether the Instruments were securities under the Acts. In making this claim, however, Thompson all but ignores authority in this circuit and elsewhere suggesting that the opposite is true: for example, we have previously held that, in the context of a civil suit, the ultimate question of whether an instrument is a security is "a question of law and not of fact," such that submitting the question to a jury was error. Ahrens v. Am.-Canadian Beaver Co., 428 F.2d 926, 928 (10th Cir. 1970); accord 4–82 Modern Federal Jury Instructions—Civil, ¶ 82–3, Comment, n.13 ("[T]he question of whether a security is within the terms of the Security Act is better viewed as a question of law for the court."); see also McNabb v. S.E.C., 298 F.3d 1126, 1130 (9th Cir. 2002) ("Whether a note is a security under the 1934 Act is a question of law, which we review de novo."); S.E.C. v. Life Partners, Inc., 87 F.3d 536, 540-41 (D.C. Cir. 1996) (same).

The Supreme Court's decisions in this area also suggest that, at least in the context of civil suits, the ultimate determination whether an instrument is a security is one of law. For example, in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), the Court decided that interests in orange groves were securities as a matter of law over the dissent of Justice Frankfurter, who "call[ed] for the Court to uphold the district court's determination as a

16

reasonable factual finding rather than a freely reversible legal issue." See U.S. v. Johnson, 718 F.2d 1317, 1332 (5th Cir. 1983) (en banc) (Williams, J., dissenting) (emphasis added). Similarly, both the Court's language in Reves and the complexity of the test it endorsed there—prescribing a rebuttable presumption, comparison of the subject instrument to a judicially crafted list of non-security instruments, and an inquiry into the existence and adequacy of alternate regulatory schemes—strongly suggest that, at least in the civil context, the ultimate conclusion that a "note" is a security is one for the court to make as a matter of law. See, e.g., Reves, 494 U.S. at 61 ("[T]he task has fallen to the Securities and Exchange Commission . . . and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes" (emphasis added) (internal quotation marks omitted)); id. at 67 (instructing "courts" to compare the subject instrument to a "judicially crafted" list of non-securities, and if the subject "instrument is not sufficiently similar to an item on the list," to decide "whether another category should be added" by examining the "family resemblance" factors (emphasis added)).

Of course, none of this is to say that summary judgment will be appropriate where the parties have identified genuine disputes of material fact that could tip a reviewing court's balance of the "family resemblance" factors articulated in Reves. Indeed, as we observed recently elsewhere in the context of a criminal case, the individual factors of the "family resemblance" test, which inquire into "motivation, distribution, expectation, and risk," lead us to conclude that "the question of whether a note is a security has both

17

factual and legal components." United States v. McKye, ---F.3d---, No. 12-6108, 2013 WL 4419330, at *4-*5 (10th Cir. Aug. 20, 2013) (holding that, notwithstanding the complexity of the Reves test, in the context of a criminal case, the ultimate question whether an instrument is a security must be submitted to the jury when it "implicate[s] an element of the offense."). However, following previous Tenth Circuit precedent, see Ahrens, 428 F.2d at 928, we hold that, in the context of a civil case where the "security" status of a "note" is disputed, the ultimate determination of whether the note is a security is one of law; thus, resolution of factual disputes will be necessary only in those rare instances where the reviewing court is unable to make a proper balancing of the family-resemblance factors without resolving those factual disputes.[8]

That leads us to the second, related point: we conduct our analysis today mindful of the way in which the presumption that all notes are securities, see Reves 494 U.S. at 67, colors, at the summary judgment stage, the evidentiary burden of a non-movant who argues that a note is not a security. If, as here, the moving party can satisfy its "initial responsibility of presenting evidence to show the absence of a genuine issue of material fact," Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996), the non-movant must make "a showing sufficient to establish" that the note is not a security, because the presumption that all notes are securities means that the non-movant would ultimately "bear the burden

---

[8] Even if the ultimate "security" determination were one for the jury, as our subsequent analysis makes clear, the record in this case is sufficient to justify summary judgment for the SEC on the issue of whether the Instruments were securities.

of proof" on that issue at trial.  See Celotex, 477 U.S. at 322.  This required showing, we think, means that the non-movant's evidence that notes are not securities, if believed, must create a material amount of persuasion above equipoise, because it would have to be sufficient to overcome the presumption that all notes are securities.

We can now turn to the four factors from Reves to determine whether, as Thompson alleges, the district court erred when it ruled that the Novus Instruments were securities as a matter of law.

**C. Application of the "family resemblance" test to the Novus Instruments**

Thompson claims that he has raised disputes of fact material to whether the Instruments were securities, so that the district court's grant of summary judgment on that issue was error.  In the discussion that follows, we limit our consideration to facts Thompson does not dispute and draw all reasonable inferences in his favor.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 644, 670 (10th Cir. 1998).  Even when viewed in the light most favorable to Thompson, however, Thompson cannot meet his burden to rebut the presumption that Novus's Instruments were securities under Reves's family-resemblance test.

**1. Motivations of the parties**

We first examine the motivations that would prompt a reasonable buyer and seller of the Instruments to enter into the transaction.  Reves, 494 U.S. at 66.  "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is

19

expected to generate, the instrument is likely to be a 'security.'" Id. On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security.'" Id.

This factor clearly favors a finding that the Instruments were securities. As to Novus's motivation for issuing the Instruments, Thompson's own sworn statement reflects that "Novus started borrowing funds from companies owned by our friends and families and using most of those funds to grow a reserve toward the $12 [m]illion needed to fund the China Biodiesel project, earning interest by placing them with either Hall or Holloway." Aplt. App. at 167; accord id. at 168 (characterizing the Instruments as "a business-to-business loan to be used for the growth of Novus at our discretion" (emphasis added)). And on their face, most of the Instruments bore the following: "[i]t is expressly understood between the parties that the Borrower shall be using the proceeds from the Note for further investments . . . ." Id. at 246. Thompson does not claim that Novus issued the Instrument for any other purpose than to "raise money for the general use of [its] business enterprise [and] finance substantial investments," Reves, 494 U.S. at 66.

As to the motivation of the holders, the attractive interest rate the Instruments guaranteed provides strong evidence that holders were "interested primarily in the profit the note [was] expected to generate," id. Novus promised investors monthly returns of between three and five percent (i.e., annual returns of between thirty-six and sixty

20

percent) on the money they "loaned" Novus.  See Wallenbrock, 313 F.3d at 538 ("[T]he

promise of a high, stable 20% interest rate likely attracted investors looking for

significant profits."); Stoiber v. SEC, 161 F.3d 745, 750 (D.C. Cir. 1998) ("[A] favorable

interest rate indicates that profit was the primary goal of the lender.").  Thompson also

acknowledges that early prospective holders "wanted to participate" after he told them of

the returns he was making in Hall and Holloway's "programs," and so "they loaned funds

to Novus and then [he] loaned them to Casey Hall."  Supp. App. at 230.

The record also contains substantial evidence that the holders understood that

Novus was investing their money, and not "correct[ing] for [its] cash-flow difficulties, or

. . . advanc[ing] some other commercial or consumer purpose," Reves, 494 U.S. at 66.

As we have already emphasized, the Instruments themselves stated that "[i]t is expressly

understood between the parties that the Borrower shall be using the proceeds from the

Note for further investments . . . ."[9]  Aplt. App. at 246 (emphasis added); See Stoiber, 161

---

[9] When it switched to the joint venture agreements, Novus removed the language
indicating that holders' money would be used for "further investments."  However,
Thompson's attorney conceded that there was "no difference between the joint venture
and the note," neither of which required holders of the Instrument to do anything "besides
give the[ir] money."  Supp. App. at 424.  The joint venture agreement characterized the
purpose of the venture as providing "working capital," but it repeatedly referenced
"generat[ing] a return on investment," and it stated that the holder "expressly represents .
. . that [the holder] has the ability to provide . . . discretionary investment funds," and that
Novus would use holders' funds in compliance with, inter alia, "all banking and
securities laws."  Aplt. App. at 312-15 (emphases added).  If anything, we think the
changes to the Instrument made more clear to holders that their money was being used
"for the general use of [Novus's] business enterprise or to finance [Novus's]
investments," see Reves, 464 U.S. at 66.

21

F.3d at 749 (holding that information contained in "reaffirmation statements" signed by customers showed they knew most of the money would be used for commodities trading, which clearly fell under Reves's "financing substantial investments" language).

In response, Thompson invokes what he calls a "compendium of declarations from sixteen persons who each made one or more loan [sic] to Novus," which Thompson claims provides enough evidence to create a genuine dispute of material fact as to the holders' motivations for entering into the Novus transactions. Aplt. Br. at 24-25. But this "compendium" does not appear in the record before this court, and so we decline his invitation to consider it.[10] United States v. Stoner, 98 F.3d 527, 530 (10th Cir. 1996)

---

[10] Even if we were to consider this evidence, the holders' conclusory characterizations of the transactions as "loans" or "investments" are not relevant to the "motivation" factor, which, as we have already explained, asks why the holders gave Novus money, and for what holders believed Novus was using it. Thompson identifies no evidence in the record suggesting that holders believed their money was to be used "as stop-gap measures to correct for cash-flow difficulties, loans to facilitate the purchase of minor assets, or notes grounded in a traditional commercial purpose," Wallenbrock, 313 F.3d at 538. In fact, the evidence in the record strongly suggests the opposite. See, e.g., Aplt. App. at 170 (Thompson's declaration) (stating that prospective holders "invested with Novus, not because of any specific representation, [but] because they had heard that people who had lent us money had been paid as agreed . . ."); id. at 239-40 (Novus's web site) (admonishing that the Instruments were "not an investment program," but then characterizing them as "Money Technology," which would allow holders to "[r]ealize and multiply the value of [their] money by strategically repositioning [their] cashflow and assets," and promising to "show companies how to reposition their idle assets and cash into powerful money generating tools" (emphasis added)).

As to Thompson's claim that holders loaned Novus money because they "trusted" him, that evidence does not assist Thompson at all, because trust would be an expected ingredient in making either a loan or an investment. See Stoiber, 161 F.3d at 750 (considering appellant's similar claim that customers provided funds "because of the personal relationships [appellant] had with them," and admonishing that "[t]his display of

Continued . . .

("The appellant is responsible for insuring that all materials on which he seeks to rely are part of the record on appeal.").

In sum, the apparent motivations of the parties to the Novus transactions bear little resemblance to the motivations of ordinary parties who would enter into the categories of non-securities instrument listed by the Second Circuit in Exchange Nat'l Bank of Chicago and Chemical Bank: while the usual "buyers" of those non-securities notes— sophisticated banks and outfits offering purchase-money loans—may be motivated by profit, the "sellers," unlike Novus, are ordinarily consumers or businesses motivated to correct temporary cash-flow difficulties or to make one-time purchases of items which will function as direct collateral in case of default. We hold that the "motivation" factor cuts strongly in favor of Reves's presumption that the Instruments are securities.

## 2. The plan of distribution[11]

The second Reves factor asks the court to determine whether the Instruments were ones in which there was "common trading for speculation or investment." Reves, 494

---

trust . . . does not speak to the note holders' original motivations in making the loans[,] . . . [but r]ather . . . to the information available to them when deciding whether the notes involved a tolerable level of risk").

[11] Thompson's lawyer conceded this factor at the summary judgment hearing when he stated that Thompson and Novus "did advertise [the instrument] on the website . . . [and] if you were to argue to a jury that that's not public, that would be a waste of your time and you'd lose credibility doing it." Supp. App. at 421. Ordinarily, "[w]hen a party concedes a legal issue in the district court, we will not review the issue on appeal." Neal v. Sandia Nat'l Labs., 157 F. App'x 67, 69 (10th Cir. 2005) (unpublished) (citing, e.g., Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 722 (10th Cir. 1993)). However, we nevertheless analyze this factor so as to be able to assign it the proper weight.

U.S. at 66. Though it can be a strong indicator that a note is a security, the sale of the notes on an exchange is not necessary to establish the requisite common trading. Id. The same is true with respect to other characteristics common to many types of securities, such as transferability. See Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc., 198 F.3d 685, 699-700 (8th Cir. 1999). Ultimately, the Supreme Court has instructed that the offer and sale of instruments to a "broad segment of the public" is all that is necessary to establish this element. Reves, 494 U.S. at 68; see also id. at 61 (emphasizing that Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment"). Importantly, an "evident interest in widening the scope of distribution," combined with the "broad availability of the notes" can tip this factor "strongly in favor" of classifying the note as a security. Wallenbrock, 313 F.3d at 539.

Thompson claims that the "Novus notes, sold mostly by word-of-mouth to sixty people, many of whom were family and friends, certainly were not 'sold to a broad segment of the general public.'" Aplt. Br. at 28. But the record belies this contention. Instead, Thompson's own sworn statements leave us with the firm conviction that, while Novus's first holders may have been Thompson's "family and friends," Novus sought to expand its distribution to anyone interested who had $100,000 to invest—even if that meant unsophisticated investors obtaining the money by liquidating home equity—and it made its Instruments available to anyone willing to pay.

24

According to Thompson, Novus's "loan program" started off small and ad hoc, but "when more and more people were interested in the loan program, . . . [Thompson and his partner Johnson] decided to turn it into more of a business." Supp. App. at 236. To that end, between December 2006 and February 2007, Thompson admits that he "participate[d] in conference calls with people who were interested in placing funds with Novus." Id. at 267. These calls were frequently arranged by Carol Dysart, "a highly motivated marketer" and an agent of Equidigm Financial Group, another company cofounded by Thompson. Id. at 266-67. By February 2007, Novus was paying referral fees to existing holders who brought in new prospective holders. Id. at 263. Also by this time, Thompson had begun delivering shopping-mall seminars promoting Novus's "loan program" and maintaining a web site, accessible to the general public, advertising both the Instruments and the seminars.[12] And by April 2007, Novus had engaged Equidigm to train Equidigm's agents to sell the Instrument on commission.

Against this background, Thompson nevertheless insists that Novus never targeted the general public with its Instruments. He claims that Novus always required its holders to be a "business," stressing that, from February 2007 on—after Novus converted the Instruments from unsecured promissory notes to joint venture agreements—Novus contractually required holders to be "accredited" or "sophisticated" investors. Aplt. App.

_____

[12] Although the seminars were advertised as "by invitation only," Aplt. App. at 489, complimentary tickets could be downloaded by anyone at no cost from Equidigm's website, which was accessible to the public at large. Supp. App. at 74-77.

25

at 313. However, these new requirements appear to have been mere formalities designed specifically to circumvent the Securities Acts while maintaining a broad distribution base. See Aplt. App. at 176-77 (Thompson's declaration) (describing how Novus hired an attorney who informed Thompson that the promissory-note Instruments "could be considered to be a security . . . because of the number of the promissory notes being used by Novus," and advised "Novus to change its documenting method of accepting loans to a 'Joint Venture' Agreement to help stay away from any grey area" (internal quotation marks omitted)).

Indeed, Thompson offers no evidence that Novus ever sought to verify the accreditation status of any of its prospective holders, or to change any of its other business practices, with the adoption of the joint venture agreements. To the contrary, the record shows that even after adding the new contractual provisions, Thompson targeted unsophisticated investors with whom he had no prior relationship: at his seminars, for example, Thompson advised prospective holders on basic investment concepts, such as how to obtain cash from home equity, and the importance of registering a company to avoid personal liability.[13] Thompson also acknowledges that "[f]or those

---

[13] For example, a characteristic segment of one seminar betrays Thompson's expectations about the sophistication of prospective holders:

> Now I'm going to tell you two things that I'm asking you to consider doing regardless if you participate in our program or not. One of those is you have a company. How many of you have a company right now that you are

Continued . . .

the owner or you have a company?  Raise your hands high.  Okay.  So some of you still don't have a company.

If you do nothing else I suggest that you register a company, at least an LLC.  It could be a C corp., S corp., it doesn't matter.  All of you that have different types of companies, great.  But you should at least have an LLC.  That let[s] you start operating and putting some of those assets you have into a company.  Separate yourself from that liability, if something happens, somebody sues you, whatever.  Plus give yourself the benefit and options that the tax world allows you when you're a corporation versus an individual.

When you start increasing your cash as an accredited investor or a sophisticated investor, which you've all become tonight, you should have a company that you put that into so you have that level of separation.

Aplt. App. at 411-12 (emphases added).  At another seminar, Thompson's statements indicate that Novus had already expanded its scope of distribution beyond "friends and family":

Before the first people came in, they all knew me, so they didn't even need a contract in most cases.  You know, it was a handshake and—you know, we've been making payments on time, a hundred percent track record. . . .

But because so many people don't know me now, or the company, don't know our team, we're putting together a nice packet of information . . . .

***

Each of you are going to be given a ticket. . . .  If you like what you heard tonight and you'd like to benefit someone else that wasn't here tonight, please take one of these tickets.  This will allow them to come to our seminar.  And they can go on-line to register—to reserve a seat.  So if you have somebody in mind (inaudible), please share it with them and give them one of those tickets.

Id. at 494-95, 505-06.

27

who were interested in lending money to Novus, it didn't matter to me where the funds came from as long as it was from their business," and "for those who were interested in obtaining loans from banks, I was more than willing to give them all the information that I had had," which included referring individuals to Eric Wheeler at Chase Bank, who had facilitated Thompson and Johnson's first small business loans. Supp. App. at 276-77. All of this suggests that, as a practical matter, Novus sought to sell its Instruments to anyone who could come up with $100,000. See also Wallenbrock, 313 F.3d at 539 (finding this factor cut toward "securities" where appellant "put no limitations on who could purchase the notes, offering them to any member of the general public who would make the investment").

Thompson's remaining two arguments on this factor are equally unavailing. First, Thompson points us to the case of Banco Espanol de Credito v. Sec. Pac. Nat'l Bank, 973 F.2d 51 (2d Cir. 1992), where the Second Circuit found that the plan of distribution cut against a finding that the instruments were securities. But that case is inapposite. There, (1) all parties were sophisticated commercial or financial institutions that received "detailed individualized presentations" about the product; (2) the instruments were not offered to the general public; and therefore (3) eligible buyers were limited to sophisticated entities "with the capacity to acquire information about the debtor." Banco Espanol, 973 F.2d at 55. Thus, "Banco Espanol was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements," Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 813 (2d. Cir. 1994), than

28

the Novus transactions, where the record strongly suggests that Thompson recruited ordinary people to lend Novus money under vague auspices.

Finally, Thompson claims Novus's final "loan" tally—138 Novus Instruments sold to around sixty holders—resembles the actual distribution in cases like McNabb and Stoiber, where the courts found six and thirteen customers, respectively, were not a "broad segment of the public." See McNabb, 298 F.3d at 1132; Stoiber, 161 F.3d at 751. We disagree that the group sizes in those cases are similar enough to the size of the Novus group to render the cases persuasive on the point. Compare SEC v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1128, 1131 (9th Cir. 1991) (finding the "plan of distribution" factor met where the buyer "raised approximately $2 million from at least 148 investors in several states"); Wright v. Downs, No. 91-2050, 1992 WL 168104, at *3 (6th Cir. 1992) (unpublished) (finding the "plan of distribution" factor met where the notes "were offered to all Church members from the pulpit, as well as broadcast throughout the community on eight local cable television stations," and where "more than 200 people purchased the notes in which there were no restrictions as to purchasers").

In sum, even when the evidence is construed in Thompson's favor, the only reasonable inference to be drawn is that Novus intended to make, and did make, its Instruments available to any member of the public who could afford them. We also note that the plan of distribution of the Novus Instruments bears no similarity to the typical plan of distribution in the non-security instruments on the Second Circuit's list: in those distribution plans, the party receiving the infusion of cash will often transact with only

29

one "lender"; and the "lender," ordinarily a bank or some other lending institution, will infuse cash into myriad "borrowers" as part of its ordinary course of business. Novus's scheme, on the other hand, involved one "borrower" and myriad "lenders," which resembles far more closely the activity of a company selling its own stock on an exchange. This factor strongly cuts toward finding that the instruments were "securities."

### 3. The reasonable perceptions of the investing public

Under Reves's third factor, "we examine the reasonable expectations of the investing public," with the court considering "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." Reves, 494 U.S. at 66. This factor "generally turns on whether [the notes] are reasonably viewed by purchasers as investments." Stoiber, 161 F.3d at 751. Where the instruments are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word." Reves, 494 U.S. at 69. "Conversely, when note purchasers are expressly put on notice that a note is not an investment, it is usually reasonable to conclude that the 'investing public' would not expect the notes to be securities." Stoiber, 161 F.3d at 751.

This factor is a closer call. On the one hand, the Instrument expressly stated that "[Novus] is not offering a security as defined by the Securities and Exchange

Commission." Aplt. App. at 247; accord id. at 240 (Novus web site) ("This is not an investment program."). Additionally, the Instruments bore features not ordinarily associated with securities, such as acceleration conditions, a waiver-of-presentment clause, a non-assignment clause, and an attorney-fee-collection clause. And at Thompson's seminars, he represented that the Instruments fell outside of the SEC's regulatory ambit.[14]

On the other hand, we can identify some "countervailing factors" that would lead a reasonable person to question Novus's characterization of the Instruments as non-securities. Thompson testified that he employed, from early on, a concept sounding in investment called "Money Technology," which he touted to describe the Instrument's function to prospective holders.[15] Supp. App. at 214; accord Aplt. App. at 244 ("[O]ur

---

[14] Thompson also suggests, again, that we look to the sixteen previously referenced declarations by investors, who "were not considering the notes to be investments." Aplt. Br. at 30. As we have said already, those declarations are not before us, because neither party has included them in the record on appeal. But even if we were to consider Thompson's selected highlights of these declarations, they do little to negate the possibility that holders viewed the Instruments as investments. In fact, the declarations mostly cut against Thompson. Compare Aplt. Br. at 25 (alleged excerpt from deposition of Phil Secrist) ("I understood that it [Novus program] involved business-to-business loans." (alteration in Thompson's brief)), with, e.g., Aplt. Br. at 25 (alleged excerpt from deposition of Jacob Garn) ("I would say that I invested – and if I were to summarize, I invested based on trust in Ralph Thompson . . . ." (emphases added)), and Aplt. Br. at 26 (alleged excerpt from deposition of Sharon Garn) (stating that "[we decided] that this would be an investment that was safe, that we could make" (alteration in Thompson's brief) (emphasis added)).

[15] Novus's web site claimed that it could help holders unlock the "[m]ystery of [m]oney" with "Money Technology," which would help holders "[r]ealize and multiply

Continued . . .

31

Money Technology Division was made available . . . in August 2006."). Thompson also acknowledges that early holders knew "the type of business [he] was doing," meaning that they knew he was investing their money with another entity. Supp. App. at 231. And at the Novus seminars, Thompson talked about the Instrument as though it were an investment, characterizing it as "more conservative than a 401(k)," and "less risky than putting money in the banks." Aplt. App. at 458.

We need not spend too long on this element, however, because, as the D.C. Circuit recognized in Stoiber, "[t]he Supreme Court itself described this factor as a one-way ratchet," allowing "notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are," but not allowing "notes which under the other factors would be deemed securities to escape the reach of regulatory laws." Stoiber, 161 F.3d at 751 (citing Reves, 494 U.S. at 66). And we conclude that this Reves factor leans, at least slightly, toward characterizing the Novus Instruments as securities.

---

the value of [their] money by strategically repositioning [their] cashflow and assets." Aplt. App. at 239-40. On the other hand, the site admonished that "Money Technology" was "not an investment program," but instead involved

> a company mak[ing] a loan to Novus for a period no longer than 6-months [sic] at a time. Novus promises to pay the company back their original principle [sic] with an agreed upon monthly interest rate. The loan is backed by an unsecured Promissory Note and that note is backed by Novus' company assets.

Aplt. App. at 240.

## 4. The existence of an alternate regulatory scheme or other risk-reducing factors

Under the final <u>Reves</u> factor, we look to whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." <u>Reves</u>, 494 U.S. at 67. If the instrument "would escape federal regulation entirely if the Acts were held not to apply," the fourth factor cuts toward characterizing the instrument as a security. <u>See</u> <u>id.</u> at 69 (recognizing as adequate risk-reducing factors (1) insurance provided by the Federal Deposit Insurance Corporation, and (2) comprehensive regulation under the Employee Retirement Income Security Act, because both ensure that an instrument would not "escape federal regulation entirely if the Acts were held not to apply"); <u>Wallenbrock</u>, 313 F.3d at 540 ("[A] patch-work of state regulation, which applies to most business entities in some fashion or another, cannot displace the federal regime. . . . [T]he fact that a company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws."); <u>Holloway</u>, 900 F.2d at 1488 (noting <u>Reves</u>'s clear emphasis on federal regulation and "reaffirm[ing] our holding . . . [that] state regulatory schemes cannot displace the Acts").

Ignoring the controlling cases cited, Thompson argues, citing no law, that Novus holders were adequately protected because the Utah State Securities Division ("USSD"), a state regulatory agency, was "hip-deep" in investigating Novus and its "basically local, relatively small number of loans," and because

33

the remedies available under the state and federal laws are the same, the State agency had already commenced [an] investigation, the investigation was of a local company [Novus] with no offices outside Utah, most of the small number of investors were from Utah, and the company was cooperating with the State, as the State readily admits.

Aplt. Br. at 31. But Thompson offers no argument or authority as to the nature of the USSD's state-enforcement mechanisms, how those coexist or interact with the federal Securities Acts, or how those might have protected out-of-state holders of Novus instruments. Cf., e.g., 15 U.S.C. § 77r(c) (recognizing state authority to regulate offerings of securities that are completely intra-state). Indeed, Thompson admits that at some point in its investigation the USSD "turned the matter . . . over to the SEC." Aplt. Br. at 31. Perhaps it did so because it realized that Novus had issued the Instruments to holders outside of Utah, and consequently that Novus's program has expanded beyond the USSD's jurisdiction. In any event, Thompson's alternative-regime argument lacks any support and runs counter to Reves's clear emphasis on federal regulation, see, e.g., Reves, 494 U.S. at 69; Holloway, 900 F.2d at 1488, and we therefore reject it.

Our review of Reves's fourth factor can also take into account other risk-reducing features, such as the existence of collateral backing the notes, see Stone, 998 F.2d at 1539 (fact that instruments were collateralized led to finding risk-reducing factor). But Thompson does not advance any such argument.[16] Indeed, the Instruments labeled

---

[16] In his Reply brief, Thompson argues for the first time that "Novus clients could seek relief through a breach of contract claim if Novus defaulted on the loans." Aplt. Reply Br. at 3. We "decline[] to consider arguments that [we]re not raised, or [we]re

Continued . . .

"unsecured promissory notes" only vaguely stated that they were "secured only by the assets of [Novus], its successors and assigns," Aplt. App. at 247, and the joint venture agreements made no mention of the issue at all. Thus, Reves's fourth factor weighs heavily in favor of the presumption that the Novus Instruments were securities.[17]

_____

inadequately presented, in an appellant's opening brief." Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007). Nor, in any event, would this argument have any force since in nearly all securities fraud Ponzi schemes the investors would have a potential contract claim against the issuer.

[17] Thompson argues that, "[w]hile not part of the Reves test, the courts are generally inclined to look more closely at notes maturing in less than nine months and are less inclined to automatically label them as securities." Aplt. Br. at 32 (citing SEC v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125, 1133 (9th Cir. 1991)). We do not understand Thompson to argue that the Instruments' six-month maturity period removes them entirely from the ambit of the Securities Acts, or that the Reves presumption applies only to longer-term notes. See Holloway, 900 F.2d at 1488-89 (exception is "limited to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public"). And SEC v. R.G. Reynolds Enterprises, Inc. is of no help to Thompson. The Reynolds court addressed a note's maturity term under the fourth Reves factor—as a feature that might "significantly reduce the risk of the instrument, thereby rendering the application of the Securities Acts unnecessary." In Reynolds, the appellant had issued promissory notes to investors and promised to pay between twenty and thirty percent interest at a specified time in the future, usually between six and twelve months. Id. at 1128. The court acknowledged that "the longer one's funds are to be used by another, the greater the risk of loss," but continued that "[i]n the instant case, those investors who were issued six month promissory notes were no less in need of statutory protection than investors who received twelve month promissory notes," and "the shorter term of some of the promissory notes did not materially reduce the risk to investors." Id. at 1133 (internal quotation marks omitted). Thompson does not explain how the six-month term of the Novus Instruments might have materially reduced the risk of loss to investors so as to remove the need for the protection of the Securities Acts, and as we have just discussed, Reves's fourth factor otherwise weighs heavily in favor of finding the Novus Instruments to be securities.

35

### 5. Conclusion: the Novus Instruments are securities under <u>Reves</u>'s family-resemblance test

We conclude that Novus's Instruments are securities under the family-resemblance test articulated in <u>Reves</u>. Our analysis of the test's four factors confirms that the Instruments bear little resemblance to the categories of non-securities instruments on the Second Circuit's judicially crafted list. And that same analysis—under which we concluded that the first, second, and fourth factors cut strongly in favor of classifying the Instruments as securities, and that the third factor slightly suggests classification as a security as well—counsels against adding a new category of non-security to the Second Circuit's list. In sum, even construing all of the facts and reasonable inferences to be drawn therefrom in Thompson's favor, we hold that Thompson cannot rebut the presumption that the Novus Instruments were securities.

## D. The <u>Howey</u> test for "investment contracts

The district court also found that the Instruments were "investment contracts" under <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 301 (1946) (making the test for securities "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others"). In light of our conclusion that the Novus Instruments were securities as "notes" under <u>Reves</u>, we need not reach whether they were also securities as "investment contracts" under <u>Howey</u>.

36

## CONCLUSION

For the foregoing reasons, we conclude that no genuine issues of material fact exist as to whether the Novus Instruments were securities.  As a matter of law, the Instruments were securities as "notes" under the test articulated in <u>Reves v. Earnst & Young</u>.

We AFFIRM.